## CHARLESTON.

### HALFPENNY & HAMILTON *v.* TATE & McDEVITT *et al.*

Submitted September 4, 1908.    Decided March 9, 1909.

1. FRAUDULENT CONVEYANCES—*Hindering and Delaying Creditors.*
   The terms "defraud," "hinder," and "delay" as employed in section 3099, Code 1906, are not equivalent terms. To hinder and delay ones creditor, within the intendment of said section, is as much provided against as to wholly defraud him. (p. 298.)

2. SAME—*Evidence.*
   A case of fraudulent sales and transfers of property, governed and controlled by rules and principles announced in many previous decisions. (p. 303.)

3. SAME—*Suit to Set Aside.*
   The right of a creditor to subject to the payment of his debt, the property of his debtor fraudulently conveyed does not depend on the question of the insolvency of the debtor. In this state the statute gives absolute right to a creditor, to a suit in equity to annul a fraudulent conveyance, and he is not compelled to first exhaust other property of his debtor by execution or otherwise. (p. 303.)

Appeal from Circuit Court, Randolph County.

Bill by Halfpenny & Hamilton against Tate & McDevitt and others. Decree for plaintiffs for less than the amount claimed as against Tate & McDevitt, and plaintiffs appeal.

*Reversed, Modified and Remanded.*

W. B. MAXWELL, for appellants,

JARED L. WAMSLEY and W. E. BAKER, for appellees.

MILLER, PRESIDENT:

The object of the bill is to set aside as fraudulent and void, as against plaintiffs, the sale by Tate & McDevitt to G. H. Gates & Co., and by Gates & Co. to Kl. H. Stover, of about nine hun-

dred and fifty thousand feet of manufactured lumber, and to subject the same to the lien of plaintiffs attachment sued out in the cause, and levied thereon, and taken into custody by the sheriff. The lumber attached was the same which, by prior contract in writing, dated November 26, 1906, Tate & McDevitt, had agreed to sell and deliver to plaintiffs, free on board cars at Kingsville, W. Va., a small station on the Coal & Coke Railroad, in Barbour county, but which, after delivering a small portion thereof, and pending the further execution of the contract, by contract in writing, on October 11, 1907, they undertook to sell and deliver, for the purported consideration of thirteen thousand dollars, cash in hand, to G. H. Gates & Co., and which lumber said Gates & Co., acting through G. H. Gates, on or about October 17, 1907, by a parol contract, pretended to sell to said Stover, at the price of seventeen thousand dollars, to be paid for as delivered by them on cars. At the time of the sale to Gates & Co., about three hundred thousand feet of this lumber had been already delivered at the railroad by Tate & McDevitt, to be loaded on cars for plaintiff; and at the time of the sale by Gates & Co. to Stover, about sixty thousand feet more had been delivered there, and the residue either remained at the mills, or on stump in the woods to be manufactured.

The plaintiffs claim is for $3,581.29, the balance, with interest, of $5,000.00, advanced by them to Tate & McDevitt, on account of said lumber, less $1,561.12, in lumber delivered on account. In addition plaintiffs claim $5,000.00 damages for breach of contract, but the attachment does not cover the damages claimed, and no serious effort seems to have been made to prove actual damages. Tate & McDevitt in their answers also make a counter claim for damages, on the theory of a breach of the contract on the part of plaintiffs to furnish cars and inspectors. But the contract does not stipulate that plaintiffs were to furnish either cars or inspectors. Besides, Tate in his testimony admits having received orders from plaintiffs, and excused himself to plaintiffs for failure to make shipments, on the ground that he could not get cars. There seems to have been some trouble to get cars, but this was due to no fault of plaintiffs. No serious effort was made by Tate & McDevitt to show damages.

While the answer of Tate & McDevitt deny intention to defraud plaintiffs, they do not deny the material facts charged in

65 W. Va.

the bill, as constituting the fraud, and in their evidence they admit facts not only constituting fraudulent intent but actual fraud on their part, in the disposition of said lumber and other property. We will not undertake to detail the evidence on this point. It conclusively establishes the fraud charged on their part, and we do not hesitate for a moment to pronounce judgment of conviction against them.

But the answers of G. H. Gates & Co. and of K. H. Stover put in issue the question of the *bona fides* of the purchases of the lumber by them. Both claim to be innocent purchasers for value, without notice of the fraud of Tate & McDevitt. On the hearing the circuit court dismissed plaintiffs bill as to them holding the lumber attached, not liable to plaintiffs attachment, but referred the cause to a commissioner to state the condition of the account between plaintiffs and Tate & McDevitt, and decreeing that the Peoples National Bank, garnishee, should pay to plaintiff the sum of $21.02, admitted to be due from them to Tate & McDevitt, and from this decree plaintiffs have appealed.

The specific allegations of the bill are not as broad as they might be to cover the case made by the evidence. It does charge that the object and purpose of Tate & McDevitt in making the subsequent sales thereof was to avoid delivery of the lumber to plaintiffs, and to avoid repaying plaintiffs the balance of the advances made by them on said lumber, and that Gates & Co., and Stover had notice thereof. This charge taken in connection with other allegations we think equivalent to a charge of intent to wholly defraud plaintiffs; but as the answers deny this, it would have been better pleading to have charged also that the sales were made for the purpose of hindering and delaying plaintiffs in the collection of their debt; for the terms defraud, hinder and delay are not equivalent terms, and to hinder or delay are as much condemned by the statute, section 3099, Code 1906, as to wholly defraud a creditor. *Edgell* v. *Smith,* 50 W. Va. 349, 355, 356. And as the Court says in the case just cited, quoting, at page 356: "But in order to render a deed fraudulent, it is not necessary that the debtor should intend to entirely defeat the creditor in the collection of his claim. Creditors are entitled not only to be paid, but to be paid as their claims accrue, and a debtor has no more right to postpone payment simply for his own advantage, than to defeat it altogether. A purpose to delay

and hinder a creditor is therefore fraudulent, although the debtor may honestly intend that all his debts shall ultimately be paid. * * * * The words 'hinder,' 'delay,' and 'defraud' are not synonymous." The allegations of the bill, taken as a whole, however, we regard equivalent to charging in the terms of the statute intent not only to wholly defraud, but also to hinder and delay plaintiffs.

On the subject of proof not only the evidence of plaintiffs, but that of defendants, also, abundantly establishes intent not only to wholly defraud plaintiffs, but also to hinder and delay them. Both Tate and McDevitt are and were non-residents. Their non-residence was the basis of plaintiffs attachment. Mc-Devitt had been temporarily in West Virginia, superintending their lumbering operations. ' Tate was rarely here, although he appears to have come to West Virginia to negotiate the sales to Gates & Co., if not to Stover. Tate was also the principal witness for defendants. In attempting to assign a reason for selling to Gates & Co., he professes to have been afraid Half-penny would go back on him, because, as he claimed, he had gone back on him in the purchase of a tract of timber land for Tate & McDevitt, and on which he had advanced $4,185.00 of purchase money, and taken title to himself as security. Plain-tiffs were to have had the lumber manufactured from this land, but Tate & McDevitt having found a purchaser for the lumber at the price of ten to twelve thousand dollars, which would yield them a large profit, applied to Halfpenny for permission to sell, which Halfpenny agreed to, on condition that he should be paid a bonus for the use of his money, and as compensa-tion for the loss of prospective profits on the lumber which his firm was to have had from the land. Some controversy arose between the two as to what this bonus should be and on this account Tate professed the belief that Halfpenny who had been disposed to go back on him in that transaction might also at-tempt to "do him" in the other, and in the language of modern slang, he concluded to try and "beat them to it." This he pro-ceeded to do by the sale to Gates & Co., of all of the lumber on which plaintiffs had made the advances to his firm, and to Gates individually of every species of property owned by his firm, and so far as the record shows, owned by the individual members thereof in the State of West Virginia, including horses, wagons,

harness and all equipments employed by them in their lumbering operation. The sale of the property to Gates individually was upon the pretended consideration that Gates should assume and pay all the outstanding debts of Tate & McDevitt, an indefinite amount, but estimated by him and Gates at about $2,000.00, but not including any indebtedness to plaintiffs. So that nothing remained of the individual or firm assets, not thus sold and disposed of, out of which plaintiffs could realize their money. Tate admits that before selling to Gates & Co. he had made efforts to sell the lumber, first to Captain Cobb, and then to one C. T. Nelson. But both Cobb and Nelson, readily perceiving the flavor of his fraudulent intentions, declined to become parties to the fraudulent scheme. Tate says that he then sought legal counsel, and was advised that he could not make a sale that would stand against plaintiffs, unless he could dispose of the lumber to a *bona fide* purchaser, for adequate consideration and without notice of his fraudulent intent. Then it was, he says, that he approached Gates, on a Sunday, and proposed to sell to him, giving him no notice, and who, so far as he professes to know, had no notice of plaintiffs rights, or of his purposes in making the sale, and that on the following day he succeeded in selling the lumber to Gates & Co., at the cash price of thirteen thousand dollars, and a day or two later to Gates individually the other property of his firm. As to this want of notice or knowledge to Gates, Tate, of course, had corroboration in the testimony of Gates himself. But the inculpating facts, shown in the evidence on both sides, satisfy us, beyond all doubt, that whether or not Gates had actual knowledge or notice, the facts and circumstances surrounding him at the time of his purchases were of the character to charge him with full knowledge and notice of the fraudulent purposes of Tate & McDevitt. The fact that Tate sought out Gates on a Sunday night and proposed to sell at a lump sum, and that Gates, who had not seen the lumber, was not acquainted with the market, and agreed to buy almost immediately on the bare representations of Tate, as to the character and quality of the lumber and was so ready and willing to go into so large a transaction, is strongly indictive of fraud. And the further fact that almost immediately thereafter he also agreed to buy the other personal property of this firm, on the terms already stated also goes to

show the bad faith of the transaction. The following language which Gates professes to have addressed to Tate, at the time of the purchase, is also significant: "I says to Mr. Tate, I says, now put this down good and low so I can buy it and pay cash for it, and you know that beats cats and dogs. That is the way I said it to him." Men do not usually engage in legitimate transactions in this way. Gates admits having been a creditor of Tate & McDevitt, presumably growing out of their lumbering operations. He was not engaged in buying or selling lumber; he dealt in horses and mules and in lands. He had not the money himself to buy the lumber, but he professes to have had associated with him, a friend, M. L. Klock, a banker of Wellsboro, Pennsylvania, but whom he had not consulted about this particular transaction, and whom, he says he never consulted about anything, but from whom he knew the money could be obtained. In payment, he claims to have given Tate & McDevitt an order on Klock for thirteen thousand dollars; and, in his testimony in chief says that he sent his son-in-law with Tate to Pennsylvania, with a copy of the contract in writing, to see Klock, and explain to him the nature of the transaction, and to get the money; and at another place in explanation of his reason for wanting the contract in writing says: "In the first place, I suppose I had to, and in the second place I wanted to satisfy Mr. Klock that everything was right because I knew he would ask all those questions before he would pay the money." On cross examination, however, when asked how soon it was after the written contract had been executed that Tate and his son went to Pennsylvania to see Klock, he answered: "I think the next day." And when asked in the same connection, whether they took the written contract with them, he answered: "I am not sure about that * * * *but I think not." When asked to state whether Klock paid the money, he answered: "Yes sir, as far as I know. He paid it; and Mr. Tate said he paid it, and that he got it. Of course I was not there." Neither the testimony of Mann, nor Klock, alleged associates of Gates, was taken. Another significant fact is that after Gates purchased the lumber and other property from Tate & McDevitt, he left McDevitt in full charge of the property, substantially as he had been before the sale.

But even more convincing, perhaps, is the fact that about

October 16th, a few days after these purchases Gates met Stover
in a hotel at Elkins, and sold or professes to have sold the
lumber to him.  Stover had been the agent of plaintiffs in negoti-
ating for them the sale and the purchase of the lumber from
Tate & McDevitt, and had prepared the contract.  On cross ex-
amination Gates says that when Stover came into the hotel he
said to him: "Stover, you are just the man I want to see, and
I told him that I had bought a million feet of lumber on the
Coal & Coke, and as I know Mr. Stover very well, I says, 'I
want you to tell me when I have a good deal or a poor
deal.  He said I can not tell you until I hear what you have
got.  I told him what I had and he asked me what I paid for
it, and I told him, and he said, if it was log run stock and was
on the Coal & Coke, you have a good deal, and what you recom-
mend it.'  And he says what will you take for it if it is as you
recommend it?  I said I would take seventeen thousand dollars.
Mr. Stover figured a bit and said if it is log run stock and the
amount you tell me, I will take it.  Well, I said, Mr. Stover,
to be fair, we will call it a deal, but you go and look at it and
if you find the stuff there, you will take it, and if not, we won't
deal.  Mr. Sigler was sitting there and he said, 'That was the
quickest deal I ever saw in my life,' and he has been a lumber
man for years."  Gates professes he sent McDevitt with Stover
to the mills to see the lumber.  When Stover was asked whether
he understood it to be the same lumber sold by Tate & McDevitt
to Halfpenny & Hamilton, he answered: "No not exactly.  After
telling me that eight car loads had been shipped it was my
impression that the advance had been covered by these ship-
ments."  According to their testimony the contract between
Gates and Stover was that Gates was to deliver the lumber on
board cars, and Gates professes to have employed McDevitt to
perform this part of the contract.  After Gates had sent out
men a time or two to load cars and found the expenses too
great, he says, "I went to Mr. Stover and told him it would not
do, and he said he could not help it, and I said, what will you
take and load this lumber yourself?  He asked me one dollar
per thousand if I remember but we made the bargain at 75c,
and then I put a man to tally and paid him myself."  Thus
Gates & Co., stepped down and out, leaving Stover and Mc-
Devitt in charge.  If defendants Gates and Tate are to be be-

lieved, Gates & Co. had paid cash, but Stover had paid nothing, at the time the lumber was levied on by the attachment in this case for Stover was to pay only as the lumber was delivered on cars. Afterwards, and after this suit was brought, we find Gates in Philadelphia, where he met J. L. Broadfoot, who had been an inspector of lumber for the plaintiffs, and spoke to him about selling lumber he was interested in. When asked what lumber it was he was interested in he replied: "Mr. Stover told me that anyone I saw that would sell this lumber he would pay for it, and I understood that Mr. Broadfoot said that he was out of work and he would know where to get buyers, and that was the reason I spoke to him about it." Q. Then you were trying to sell Mr. Stover's lumber were you? A. I was not trying, no sir, but was trying to help him in selling it." The price which Gates & Co., were to pay Tate & McDevitt was several thousand dollars less than they would have realized at the prices at which it had been sold plaintiffs. Many other inculpating facts appear, but we have already detailed enough of the evidence to show the baldness of the fraud.

The legal principles applicable to transactions of this character are so well known to the profession, and have been so often declared in the decisions of this Court, that it is unnecessary to repeat them here. One proposition, however, may deserve more than this passing notice. Counsel for defendants say that as the bill does not charge insolvency of Tate & McDevitt, and as they appear to have realized in the sale of lumber some thirteen thousand dollars, and it does not clearly appear that the plaintiffs cannot obtain satisfaction of their debt by legal process against them, they have no legal or equitable right to subject the property attached to the payment thereof.

But the rights of a creditor to subject to the payment of his debts the property of his debtor fraudulently conveyed does not depend on the question of the insolvency of the debtor. Insolvency is often an element going to show fraud; but the creditors right to pursue the property fraudulently conveyed is not controlled thereby. While a different rule may prevail in some jurisdictions it is not the law of this state that the creditor must first exhaust the debtors other property. The statute of this State against fraudulent conveyances gives an absolute right to creditors to a suit in equity to annul a fraudulent conveyance, and

they are not compelled first to subject other property of the debtor, by execution or otherwise. *Hoffman* v. *Fleming,* 43 W. Va. 762 (14 A. & E. Ency. Law. 329, 330). And, as was held in *Edgell* v. *Smith, supra,* "If the intent is to either hinder or delay them, or defraud them, by a conveyance which places an obstacle in the way of the prosecution of their legal remedies, it is void under the statute against fraudulent conveyances." There can be no doubt of the fraudulent intent of the debtors in this case to put all their visable property out of the reach of plaintiffs by legal process, and to wholly defraud them. To all intents and purposes they admit it. When attempting to sell the lumber to Nelson, Tate admits having said to him that Halfpenny was trying to do him, and that he was going to see if he could not take care of himself. And when Halfpenny called to see him at Bellefonte, Pennsylvania, after the sales to Gates & Co., and to Stover, Tate said to him, "I have my money in my sock and you can run after me as I ran after you for over six weeks." And when Halfpenny replied: "You are going to do me Tate," he answered, "No, but I am going to have my own, and I am in position to get it." And when Halfpenny asked him what damage he wanted, he answered in substance, if your nerves are not strong hold on to the chair you are sitting on good and tight, for I just want ten thousand dollars out of you, and that Halfpenny did not say anything for a while and then left.

We are clearly of opinion that the decree below dismissing the plaintiffs bill as to G. H. Gates & Co. and K. H. Stover, and abating the plaintiffs attachment levied upon the lumber in controversy, and referring the cause to a commissioner, should be reversed and annulled, and that the decree which the court below should have pronounced should be entered here.

Tate & McDevitt, as the record clearly shows, and as they practically admit, were indebted to plaintiffs for advancements made on lumber, as of October 19, 1907, $3,581.29, which, with interest thereon to July 11, 1908, the date of the final decree appealed from, aggregates $3,736.14. And it appearing that the attachment was sued out on good and sufficient grounds, the decree to be entered here, in modification of the decree below, will be that the plaintiffs recover of the defendants, Tate & McDevitt, the said sum of $3,736.14, with interest thereon from

July 11, 1908, until paid, together with their costs in this Court and in the circuit court expended, subject to a credit of whatever may be collected on the decree in favor of plaintiffs against Peoples National Bank, garnishee, and that the property attached and taken in possession by the sheriff be sold to satisfy the same. And the cause will be remanded to the circuit court for further proceedings to be had therein in accordance with the principles announced and directions given herein.

*Reversed, Modified and Remanded.*