# CHARLESTON

HUBBARD, EX'R. v. ROBRECHT.

Submitted January 19, 1915.   Decided February 2, 1915.

FRAUDULENT CONVEYANCES—*Secret Trusts—Right to Enforce—Fraud of Creditors.*

Upon a bill in equity brought by a father against his son to pro-

cure legal title to property which the father alleges he bought and paid for with his own means, and caused to be conveyed to his son, by deed apparently absolute, but upon secret trust that his son would thereafter convey it to him, whenever requested by him so to do, equity will refuse relief, if it appears that the purpose of the father, in such plan, was to hinder and delay his creditors, then existing, in the collection of their debts. In such case it is immaterial whether the son had actual knowledge of the father's fraudulent intent or not, or whether the alleged trust was express or implied.

Appeal from Circuit Court, Ohio County.

Suit by Nelson C. Hubbard, executor, etc., against Henry Robrecht and others. From a decree for defendants, plaintiff appeals.

*Affirmed.*

*John P. Arbenz,* for appellant.

*Henry M. Russell* and *White & Allen,* for appellees.

WILLIAMS, JUDGE:

John Robrecht, claiming to be the equitable owner of property in the city of Wheeling known as the St. Charles Hotel, to which his son Henry Robrecht held legal title, brought this suit to compel a conveyance of it to be made to him, and also to enjoin his son Henry from selling or encumbering it. It had been owned originally by John Robrecht and was sold under decree of court in a suit brought by Elijah Marling's Executor against John Robrecht and others, in the year 1879, and purchased by The Bank of the Ohio Valley to satisfy a lien which it held thereon. The bank then leased the property either to John Robrecht or his son Henry, the latter being the ostensible lessee. The lease continued until the 2nd of January, 1883, when the bank sold it, ostensibly to Henry Robrecht, for $16,000, and executed to him a deed therefor, absolute on its face. $2,000 of the purchase money was paid at the time by Henry Robrecht's check, and for the balance he executed his seven notes for $2,000 each, payable respectively on the 2nd day of January of each succeeding year thereafter until, and including, the 2nd of January, 1890, when the last one became payable, and immediately executed to Wm. B. Simpson, one of the officers of the bank, as trustee,

a deed of trust upon the property to secure the payment of said notes, together with interest notes on said sum of $14,000, which he had given, to be paid monthly.

The bill alleges that when said conveyance was made to Henry there was an agreement between him and his father, that the deed should be executed to Henry but that he was to hold it in trust for his father, and was to convey it to him whenever he should thereafter request him to do so; that John Robrecht negotiated for the purchase of the property for himself, agreed with the bank upon the terms of purchase and paid all of the purchase price that has been paid with his own money and means, and that his son paid no part of it; that plaintiff has had continuous possession of the property, carrying on the hotel business therein ever since said purchase; that his son Henry is insolvent, and was attempting to borrow money upon the promise of securing the lender by deed of trust upon the property. Henry Robrecht answered, denying that there was ever any trust agreement between himself and his father and averring that he purchased the property on his own account and paid for it with his own money, and that he has himself been in possession and control of the property and has continuously conducted a hotel business therein on his own account ever since said purchase. He also avers that, at the time of the purchase, John Robrecht was largely indebted, many of his creditors having obtained judgments against him on some of which executions had been returned unsatisfied; that those judgments were then valid and subsisting liens and did not become barred by limitation until long afterwards; that they were all barred at the time plaintiff brought this suit; that if plaintiff did, in fact, purchase the property and procure title to be conveyed to defendant, with the expectation that defendant would convey it to him when requested, all of which is denied, he did so for the purpose of hindering, delaying and defrauding his creditors, and, therefore, is not entitled to relief, even if he should be able to prove his allegations in respect to the trust. Defendant admitted that he had made some attempts to borrow money and intended to secure its payment by trust deed on the property. On the 27th April, 1898, on motion of plaintiff, the court granted

a temporary injunction according to the prayer of the bill. Defendant moved a dissolution of the injunction, and, on the court's refusal to dissolve it, he appealed to this court, and it sustained the lower court. *Robrecht* v. *Robrecht,* 46 W. Va. 741. The case seems to have dragged along from that time (1899) until December 30, 1912, when the decree appealed from was made. John Robrecht died testate, pending the suit, and appointed Nelson C. Hubbard his executor. The executor qualified as such and, in October, 1912, caused the suit to be revived in his name. On final hearing, on pleadings and proof, the chancellor denied relief to plaintiff, dissolved the injunction which had theretofore been awarded and dismissed the suit, and, upon the prayer of defendant's answer, which was also a statutory cross-bill, he perpetually enjoined plaintiff, his agents and servants, from interfering with defendant's possession, and the executor has appealed.

Numerous depositions were taken on behalf of both plaintiff and defendant, the last apparently taken in 1905, and the testimony is voluminous, constituting much the greater part of the printed record, and it could not possibly serve any useful purpose to encumber the reports by detailing it in this opinion. Nearly all of plaintiff's evidence was taken to prove the alleged secret trust agreement between John Robrecht and his son, to explain why it was made and to prove that plaintiff paid for the property with his own money and has, ever since said purchase, been in possession of it, conducting the hotel business therein in his own name and right; while defendant's evidence was taken to negative those claims, and to prove that defendant purchased the property in his own right and paid for it with his own money and has been in continuous possession of it himself. It is proven that both plaintiff and defendant, together with a number of plaintiff's children, lived together in the hotel continuously, until plaintiff's death, and that they were so occupying it under a lease from the bank, at the time of the purchase. A good deal of the money that went to pay for the property seems to have been derived from the hotel business conducted in the property. Bills for expenses incurred in running the hotel were sometimes rendered against John Robrecht, sometimes against Henry, and sometimes against the hotel, without

naming either as proprietor. For sometime prior to the purchase, and always thereafter, until this suit was brought, the bank account was kept in the name of Henry Robrecht, and checks thereon were sometimes signed in Henry's name, by John Robrecht, and sometimes by Henry Robrecht himself. John Robrecht says Henry signed checks only when he (John) was away from home, which appears to have been on many occasions and for several days at a time. John Robrecht was a labor contractor, and he says he had, during that time, many contracts for street paving and work of like kind, which required him to be away from home much of the time. But there is conflict between father and son respecting those contracts, the latter claiming to have been himself the contractor and his father only a superintendent of the work for him.

From the great mass of irreconcilable conflicting testimony it would be difficult to determine which one of the two contestants has prevailed in the matter of proof, and, in view of the admitted fact that, at the time of the purchase, there were numerous unsatisfied judgments against John Robrecht, it is not necessary, in order to decide the case properly, to determine that question. In our view of the law, plaintiff's prayer cannot be granted, even if he has succeeded in proving a secret trust between John Robrecht and his son Henry; nor does it affect the case if it be conceded that John Robrecht paid for the property wholly with his own means. Hence, we do not decide those controverted facts. Counsel for plaintiff admits that John Robrecht was insolvent, and argues in his brief that, if he had desired to avoid payment of his debts, he could have done so by going into bankruptcy under the bankrupt act which was in force until 1878. That would have been a lawful way to do it, for many of the debts which he owed when the property in controvery was bought, he owed prior to 1878. But he chose a method to hinder and delay his creditors, if not to wholly defeat them in the collection of their debts, that is positively forbidden by law. Assuming that John Robrecht did buy the property for himself and have the title conveyed to his son Henry upon a secret trust for himself, and paid for it wholly with his own money, the question arises, why did he do it? There can be

but one answer to the question, we think, and that is, he did it to keep his creditors from taking it for their debts. It matters not that he did it, as he says, at the suggestion of some one of the bank's officers, in order to protect the bank; neither does it strengthen his case that he may have then entertained an honest purpose to pay all his debts ultimately. He had no right thus to conceal his money from his creditors by investing it in property, held by another in secret trust for himself. It was a violation of law even to hinder or delay them in the collection of their debts. Sec. 1, Ch. 74, Code 1913; *Edgell* v. *Smith,* 50 W. Va. 349; and *Halfpenny & Hamilton* v. *Tate & McDevitt,* 65 W. Va. 296. The fact that the plan was suggested to him by the bank's officer makes his case no stronger; the act is his, no matter by whom it was suggested. The same principle applies and governs the case, as if John Robrecht had owned property and had conveyed it to his son to hinder, delay and defraud his creditors. It is fully proven that John Robrecht's purpose was to hinder and delay, if not entirely to defeat his creditors, and the actual effect has been to defeat them, for this suit was not brought until all their debts became barred. His conduct can not be explained on any other theory. While the plan adopted may have saved the bank from the annoyance of suits by John Robrecht's creditors, it was not necessary as a means of protection to its property. It was complete owner when it sold it, and would have had a vendor's lien for any unpaid purchase money, superior to any of the judgment liens in favor of John Robrecht's creditors.

Frank P. Jepson, chief witness for plaintiff, and cashier of the bank at the time of the sale, was asked on cross-examination if it was not the purpose in carrying on the transaction in that way to keep the judgment creditors of John Robrecht from knowing that he was the real party interested, and replied as follows: "It was the purpose, I presume, but only for such time as would enable John Robrecht to get on his feet." And again, when asked what trouble the bank officers anticipated from a conveyance of the property to John Robrecht, he replied: "In order that the judgment creditors would not jump on the property—have another sale and impair the value of our security." John Robrecht himself

testified that Frank Jepson, and he thought also Mr. Simpson, two of the bank officers, suggested to him that he select one of his children to whom title could be conveyed, and said to him "you better let it go that way, so the creditors won't jump on you and so the bank get their money and the creditors get their money and afterwards we could get ours; so the creditors stand back and the bank and creditors get their money afterwards." Although it appears that John Robrecht was an illiterate German, still the foregoing statement clearly shows that he understood what he was saying and discloses that his purpose was to stay the hands of his creditors. Mrs. Tannebaum his daughter testified on his behalf, and was asked to state what she knew, if anything, about the controversy between her father and her brother Henry about the ownership of the St. Charles Hotel, and replied as follows: "Well, as near as I know anything about it, it was the understanding that it was signed in Hen's name, to keep the creditors from getting it, until Pap could get it back and then Hen. was to turn it over to us. That was my understanding of it." Wm. B. Simpson, an officer of the bank and trustee in the deed of trust, testified for plaintiff, and was asked on cross-examination the following question and answered as follows: "You don't mean to say, do you, that the deed was made to Henry Robrecht by the Bank for the protection of John Robrecht against some outside matters, and that the Bank, which made the deed, didn't know of those outside matters? A. I don't know. As I told you, that is what Mr. Robrecht told me. I don't know anything about the transaction with the Bank, but in talking with John he led me to believe, and so stated to me on more than one occasion, that that was the reason; that Henry was protecting him from some unjust claim in some way."

In view of the foregoing testimony, by John Robrecht and other witnesses of his, there can be no room to doubt that his purpose, in having title to the property conveyed to his son, assuming that he was in fact the purchaser, was to delay his creditors in the collection of their debts. His purpose being fraudulent, the rule is well settled by repeated decisions by this, as well as by other courts, that equity will not relieve him from the consequences of his act. His suit rests

upon his own unjust and fraudulent conduct, and to grant relief to his personal representatives would be to assist his estate to reap the reward of his fraudulent act. That would be inequitable. Even though it be proven that the alleged secret trust existed between John Robrecht and his son and that the latter was a willing participant in the fraud, equity will not grant relief. In such case the maxim *in pari delicto potior est conditio defendentis* applies, and equity will leave the guilty parties in the situation in which they placed themselves. So that, if it be assumed that plaintiff has proven all his testator alleged in his bill respecting the trust agreement with his son Henry, he can not prevail. Equity will not enforce an agreement made between parties for the purpose of accomplishing a fraud. *McClintock* v. *Loisseau,* 31 W. Va. 865; *Craig* v. *Craig,* 54 W. Va. 183, 46 S. E. 371; *Edgell* v. *Smith, supra; Halfpenny & Hamilton* v. *Tate & McDevitt, supra;* and Sec. 1, Ch. 74, Code 1913. If we assume that no express agreement between John Robrecht and his son existed and that he caused the land to be conveyed to his son without his knowledge and simply on the faith that, as he had always been an affectionate and dutiful son, he would thereafter convey it to him whenever requested so to do, plaintiff still can not recover. In such case the fraud would prevent any valid resulting trust from arising. The case turns solely on the question of law, that John Robrecht's purpose, in any event, is clearly shown to have been a fraudulent one, wherefore equity refuses relief. The executor occupies no better position than did his testator, he stands in his testator's shoes, and can not enforce any rights the latter did not have. The decree is affirmed.

*Affirmed.*