# CHARLESTON.

NELLIE W. MURRIN v. GEORGE P. MURRIN.

Submitted April 17, 1923.   Decided October 23, 1923.

1.  DIVORCE—*Burden on Complainant to Establish Adultery by
    Strong and Convincing Evidence; Evidence Held Insufficient.*

    In order to warrant a decree for divorce on the ground of
    adultery, the burden rests upon the complainant to make out his
    case by such clear, strong and convincing evidence as to carry
    conviction to the judicial mind. Evidence which raises only
    a strong suspicion of guilt will not suffice. (p. 611).

2.  FRAUDULENT CONVEYANCES—*Equity Will not Decree Reconvey-
    ance to Fraudulent Grantor.*

    Where one makes a voluntary conveyance of property for
    the purpose of hindering, delaying or defrauding his existing
    creditors; and the fraudulent grantee by his grantor's direction
    subsequently conveys the title to another, equity will not, at
    the instance of the fraudulent grantor, set aside the subsequent
    conveyance or decree that the title be reconveyed to him.
    (p. 614).

3.  DIVORCE—*Although Wife's Conduct not Sufficient to Warrant
    Divorce to Husband, it May Preclude Her From Relief.*

    Conduct of a wife proved in a suit brought by her for a
    limited divorce on the ground of cruelty, while not sufficient

to warrant a divorce to her husband, may· nevertheless be
sufficient to preclude her from relief. (p. 616).

Appeal from Circuit Court, Wood County.

Suit by Nellie W. Murrin against George P. Murrin. From
a decree for defendant, plaintiff appeals.

*Reversed and bill and cross-bill dismissed.*

*W. H. Wolfe* and *V. B. Archer,* for appellant.
*Kreps, Russell, Hiteshew & Adams,* for appellees.

MEREDITH, JUDGE:

Nellie W. Murrin appeals from the decree of the circuit
court of Wood County, entered in a suit brought by her
against her husband, George P. Murrin, in which she sought
a divorce from bed and board on the ground of cruelty. De-
fendant filed an answer and cross-bill denying the alleged
cruel treatment of his wife, and praying for· affirmative re-
lief in the form of a divorce from the bonds of matrimony
based on her alleged adulterous acts with one, Ronald John-
son. He also sought by his cross-bill to compel his wife to
reconvey to him their residence property, situate on Washing-
ton Avenue in the city of Parkersburg.

The circuit court found for defendant on the issues afore-
said, and granted him the divorce prayed for, awarded him
the custody of the four unmarried minor children, and de-
creed that the property in question be conveyed to him.

Many of the facts are not in controversy. Plaintiff and
defendant were married in Parkersburg in 1898, and then
resided in the nearby village of Murphytown. Later they
removed to Oblong, Illinois, and again to St. Louis, Missouri,
but for the eleven or twelve years next preceding the suit
they had made their home in Parkersburg.

Defendant is by trade an oil well drilling contractor, and
proficient in the business. It was this line of work which
took him to Illinois, and when he left there in 1908, he sold
his oil interests for approximately $200,000. Shortly there-
after, he purchased and gave to plaintiff a small farm of 16
acres near Parkersburg, on which her parents resided at the
time of this suit. At this time also he purchased the Wash-

ington Avenue residence and two lots adjoining for the sum of $29,000. A large part of the proceeds of the oil interests, however, was invested in the stock of the Great American Life Insurance Company of St. Louis, and it was probably this venture which took the family there for a short time. However, this investment proved unprofitable, and he disposed of the insurance company stock and acquired an interest in the C. L. Gray Construction Company. He also lost heavily in this, and about 1912 and 1913 defendant was very much embarrassed financially, if not actually insolvent. An investment in 750 acres of land in Mississippi had apparently contributed to his situation.

At this time, for the admitted purpose of protecting his home from litigation, he, on October 11, 1912, conveyed the lot upon which his residence stood to his brother, A. P. Murrin. This lot, along with the two others adjoining had already been encumbered with trust deeds aggregating $25,000, and in the deed to A. P. Murrin, which was a purely voluntary conveyance, the grantee assumed the indebtedness to the amount of $10,000, that being the proportion estimated to be properly ascribable to the lot conveyed. Later the other lots were disposed of and the incumbrances on all three properties were released. A. P. Murrin paid nothing for the conveyance, exercised no rights of ownership over the property, paid none of the taxes assessed thereon; and the evidence seems to bear out defendant's statement that it was agreed between defendant and his brother that the latter should hold the property in trust for defendant and his family.

Defendant's financial condition seems to have improved after 1913, and in 1919 he secured contracts with the Texas Company to drill a number of oil wells in the state of Texas. These contracts made it necessary for him to go to that state, which he did, and from which he did not return until about July, 1921. The work in Texas proved profitable. He accumulated drilling equipment, the value of which is variously estimated; but which at the time of the taking of defendant's testimony, was said by him to be worth $25,000. At least he said he would take that amount if it were offered him. In addition to these circumstances, defendant's health was not good when he left for Texas in 1919, and at the time of his

return in 1921, he was suffering severely from stomach trouble and his weight had decreased from a normal weight of about 200 pounds to about 140 pounds.

While in Texas, at the solicitation of plaintiff, defendant directed his brother to convey the Washington Avenue residence to her. This was done by deed dated February 11, 1920.

During the period of the marriage five children were born, all of whom were living at the time of the suit, and whose ages ranged from twelve to twenty years.

So far, the facts as stated, are not in serious dispute. We come now to the circumstances, which, as shown by the pleadings, and the generally conflicting testimony of the witnesses, give rise to the issues involved in the case.

As already stated, plaintiff founds her claim for divorce upon defendant's alleged cruel treatment of her. Her bill of complaint states in some detail what these acts of cruelty were. We think it unnecessary to recite them at such length. First of all, she recites their marriage, the birth of their five children, and that she last cohabited with defendant in Wood County, West Virginia. On various pages of the bill appears the history of their married life and their financial condition at various times. There appears the account of defendant's business success in Illinois, and the subsequent loss of his money in the Life Insurance Company and Construction Company investments. She alleges that while his business was prospering in Texas in 1919 and 1920 he paid no attention and gave no care to his family, save to provide them with maintenance, and was totally indifferent to their welfare and health. She avers that he wrote her on one occasion to let their boy die of rheumatism, and that he forbade a necessary operation on his daughter who was suffering from curvature of the spine. The climax of his treatment of plaintiff occurred, however, when upon his return from Texas in July, 1921, he accused her privately and publicly of adultery and prostitution with one, Ronald Johnson; tortured her by twisting her wrists; threatened her life with a revolver; demanded that she convey to him the Washington Avenue home; forbade her purchasing necessary provisions and merchan-

dise for the family; and endeavored in all ways to humiliate and disgrace her.

Certain averments as to the Washington Avenue property should be particularly observed. She alleges that while he was financially involved about 1912, and was insolvent, and when his creditors were demanding payment of their debts and were threatening him, with bankruptcy, defendant, in order to hinder, delay and defraud his creditors, and if possible to save his property, conveyed the Washington Avenue residence to his brother, A. P. Murrin, for no consideration whatever, the grantee agreeing orally to hold the title in trust for defendant. She later alleged that at her solicitation defendant directed that the residence be conveyed to her. The bill concludes with prayers for a divorce from bed and board; for temporary and permanent alimony; for the custody of her unmarried children; and for an injunction to restrain defendant from disposing of or encumbering his property.

Upon the filing of the bill, the court entered the restraining order prayed for, inhibiting defendant from disposing of any of his property or encumbering the same; from threatening or injuring plaintiff; and from residing in the Washington Avenue home against plaintiff's will.

Defendant then filed his answer and cross-bill. In it he makes a general denial of the acts of cruelty charged in the bill of complaint, and avers that the last cohabitation of plaintiff, with defendant occurred, not in Wood County, but in the town of Cisco, State of Texas. He answers that while he has always made all possible provision for the maintenance of his wife and children, she was wasteful and squandered large amounts of money each year, and suffered judgments for large sums to be taken against him. He denies any indifference to the health and welfare of his children and recites occasions when he employed nurses and doctors to care for them. He denies that he ever abused plaintiff by the use of physical force or by vile and abusive epithets, or that he ever accused her of being a prostitute, all of which was alleged in the bill of complaint. He admits, however, that upon his return from Texas he charged his wife with having improper relations with one, Ronald Johnson, on two specific occasions, once in Baltimore in December, 1920, and again in

Parkersburg, in February, 1921, and at various other times and places; all of which he alleges to be true.

As to the Washington Avenue property, defendant says it is true that by reason of his connection with the unsuccessful insurance company and construction company ventures he became financially involved, and that by reason of the complex nature of the companies and the character of his connection therewith, it was impossible for him to determine to just what extent he was involved, but defendant denies that he was insolvent, or that he was ever threatened with bankruptcy, but says that there was danger of suits being brought upon claims for which he was jointly obligated, and that being fearful that his property might be involved in litigation over claims for which he was not justly liable, and in order to compel the enforcement of such claims against the parties who were justly liable therefor, defendant did transfer the Washington Avenue lots to his brother A. P. Murrin, to be by him held in trust for the defendant. He denies that such transfer was made with intent to hinder, delay or defraud any bona fide creditors from the collection of their debts. As to the conveyance from A. P. Murrin to plaintiff, defendant alleges that upon plaintiff's request, defendant had his brother make the deed, not as a gift to the plaintiff, but wholly and only that the plaintiff might hold the legal title to the property in the same manner and to the same extent that it had been held by A. P. Murrin, that is to say, in trust for the defendant, and that she so held the title at the time of the suit.

Reviewing plaintiff's alleged adulterous conduct with Johnson and her wanton squandering of defendant's money, defendant concludes his prayer for affirmative relief by asking that he be granted an absolute divorce from his wife; that he be granted the custody of his four unmarried minor children; that defendant be decreed to be the equitable owner of the Washington Avenue residence and that a decree be entered requiring the plaintiff to convey the legal title thereto to the defendant.

Plaintiff then filed her replication in which she denied specifically any acts of adultery with Ronald Johnson; reaffirmed that their last place of cohabitation was in Wood County,

West Virginia; denied that she was an improper person to care for their infant children; reaffirmed that defendant's conveyance to A. P. Murrin was for the purpose of defrauding his creditors; and denied that she held the title to the Washington Avenue residence in trust for defendant.

As already related, the court substantially granted the relief prayed for by defendant. It decreed that he be awarded a divorce from the bonds of matrimony; that he be awarded the custody of the four unmarried children; and that it appearing to the court that the plaintiff, at the time she induced her husband to cause the residence to be conveyed to her, was, without his knowledge, maintaining illicit relations with Ronald Johnson, and that it was the intention of the defendant at the time the conveyance was made that the property should be held in trust for the use of defendant's family, it was ordered that plaintiff, or a special commissioner for her, be directed to make a conveyance of the real estate to defendant in accordance with the terms of the decree.

From the foregoing averments and denials on the part of both parties, it is clear that three questions are presented: (1) Did the court err in granting the divorce to defendant? (2) Did it err in decreeing a reconveyance of the real estate to the defendant? and (3) Did it err in refusing to grant plaintiff the divorce which she asked?

We shall consider these in order. While defendant alleges a great many matters tending to show that his wife was extravagant and an improper guardian of the welfare of their children; these are not the grounds upon which he obtained his divorce. The decree was granted upon his supposedly sufficient proof of her adultery with Ronald Johnson. Although averring in general terms that they had committed adultery at various times and places during his absence in Texas, the only evidence tending in any direct way to establish their guilt is that which concerns their conduct on three particular occasions.

On one of these occasions plaintiff accompanied her invalid daughter to Baltimore, where the latter was to be operated on for a spinal affliction. They arrived there on a Friday morning in December, 1920, and in the station were met by the alleged corespondent, Johnson. Both plaintiff and John-

son claim that this was purely an accidental meeting; that he was in the station for the purpose of purchasing a ticket for Parkersburg, and by chance met the plaintiff. However, finding them there, and being interested in seeing that they secured proper hotel accommodations, he accompanied them to the Southern Hotel, which he recommended, and delayed his departure from Baltimore for two or three days, during which time he was a guest at the same hotel. Other than a subsequent meeting of plaintiff with Johnson in the lobby of the hotel for a few minutes, nothing further was proved relative to their conduct there; although it does appear that the invalid daughter did telegraph to one of her sisters in Parkersburg, and that the sister either telegraphed or wrote to her mother at once evidencing her displeasure.

The second incident relied upon by defendant occurred on a night in Febrbuary, 1921. About 9:00 or 10:00 P. M. on the night referred to, according to the testimony of Johnson, he and a friend drove to the Murrin home, as they understood that Bert Cilles, Mrs. Murrin's son-in-law, had returned from Texas, and they wished to see him. He had not returned, but plaintiff invited them in for a few minutes to enjoy a sandwich and other refreshments with herself and married sister, who happened to be there. During the call, plaintiff found it necessary to go to her room on the second floor for a few minutes, and while she was so detained, Johnson went upstairs by a back stairway to the bathroom. At about the same time, plaintiff's son returned from a basket-ball game, and he, as a witness in behalf of his father, claims that he met Johnson at the head of the front stairs, and found his mother lying on her bed partly disrobed. Plaintiff testifies that she was fully clothed, and both she and Johnson deny that anything improper occurred.

The evidence as to the third incident consists of the testimony of a neighbor who lived across an alley to the rear of the Murrin home, and who testified that about midnight of a night in June, 1920, he saw plaintiff, with Johnson and another man and woman, clothed in their night clothes in a bed room in the Murrin residence. The witness claims to have seen this from the window of his own bed room. His wife was not able to identify the persons whom she saw on this

occasion, but she did testify that it was not unusual for Johnson and plaintiff to accompany each other in his automobile at night. Plaintiff's explanation of this occurrence is that the witness was mistaken both as to the identity of the persons in the room and as to the clothes they wore; that on the evening in question her daughter, Mrs. Cilles, and Mr. Cilles were entertaining certain friends, and during part of the evening occupied the room upstairs, which was not a bed room, but which had been furnished as a den. This explanation is further fortified by evidence of an experiment which tended to show that it would have been impossible to have recognized persons in the room under the circumstances described by defendant's witness.

There is other evidence in the record introduced to show the undue familiarity which was alleged to have existed between plaintiff and Johnson. She indeed admits that he occasionally took her home from town in his car, and that on one occasion at least, they accompanied each other for a short drive late in the evening. Are these sufficient circumstances, however, upon which to decree a divorce?

Defendant asserts, and with authority, that "Adultery is peculiarly a crime of darkness and secrecy; parties are rarely surprised in it; and so it not only may, but ordinarily must, be established by circumstantial evidence." Bishop, Marriage & Divorce, Vol. 2, §613. But notice other language which the author employs, and which defendant also quotes in his brief: "The testimony must convince the judicial mind affirmatively, that actual adultery was committed, since nothing short of the carnal act can lay the foundation for a divorce."

Such was our holding in the case of *Schutte* v. *Schutte*, 90 W. Va. 787, 111 S. E. 840, and it is the doctrine to which we must firmly adhere in such cases. There the defendant was often seen riding in an automobile with the alleged corespondent, and they were on one occasion found hugging and kissing each other in a cemetery, and at another time were seen to enter a field and walk in the direction of some nearby woods, yet we stated that:

> "In suits for divorce based on alleged adultery of defendant, the burden rests upon plaintiff to make out

his or her case by clear, strong and convincing evidence, sufficient to convince the judicial mind affirmatively.   Evidence to raise a suspicion only will not justify a decree of separation,''

and we refused to enter a decree.  As stated in the body of the opinion in the same decision, we will not convict a husband or wife of unfaithfulness where they have lived together for many years and have maintained good reputations in the community, except upon clear and convincing proof.   The evidence ''must be so clear and strong as to carry conviction of the truth of the charge.''  *Huff v. Huff,* 73 W. Va. 331, 80 S. E. 846, 51 L. R. A. (N. S.) 282.

The case of *Sharp* v. *Sharp,* 91 W. Va. 678, 114 S. E. 280, cited in defendant's brief is quite a different case upon its facts, and our decision there is by no means persuasive on the facts here presented.

While plaintiff's conduct has very likely been indiscreet, we do not find that the evidence of the alleged adultery is sufficiently clear and convincing to carry conviction of the truth of the charge, and we must overrule the circuit court's finding to the contrary.  It is obviously unnecessary to consider the argument as to condonation, treated at some length in the briefs.

We now come to the second phase of the case; that is, whether the court erred in directing that plaintiff reconvey to defendant the Washington Avenue residence.  Defendant seems to advance two theories to warrant the conveyance to him, first, that the conveyance to plaintiff was never intended to be an outright gift of the property, but that she is a trustee of the title merely, and second, that at the time plaintiff induced defendant to direct his brother to convey the property to her, she was maintaining illicit relations with Johnson, and was spending defendant's money on him; all of which amounted to a fraud upon the defendant.  The circuit court seems to have incorporated both theories in its decree.

While plaintiff denies that the facts merit such a decree, she bases her chief attack upon it on other grounds.  It will be remembered that in her bill of complaint she avers that at the time defendant conveyed the residence to his brother,

he, defendant, was insolvent, was threatened with bankruptcy, and sought only to hinder, delay and defraud his creditors. Defendant's reply will also be recalled. He averred that he was not insolvent, and that he but sought to protect the property from litigation over claims for which he was not justly liable. This expression standing by itself is not, entirely clear. Much light, however, is cast upon it by the defendant's testimony. It shows that he was in embarrassed circumstances and was jointly liable with others upon notes aggregating large sums. Speaking of the occasion of his making the deed to his brother, he said:

"I never knew at all to what extent I would be liable because the collateral that was put up with all of these notes, as a going concern, was three to one, and, in many cases, four to one over what the indebtedness was to be, and like any other concern that gets insolvent——"

At this point defendant was interrupted by the following question of counsel:

"Now, you say you took steps to save the home for the children?"

To this defendant replied: "Yes, sir."

The conveyance was admittedly without consideration, and its only effect, and defendant's obvious purpose was to protect the property from creditors, the amounts of whose claims, defendant could not determine.

Although, as it turned out, no creditor was deprived of his claim, the conveyance must come within the class of transactions, the object of which is to delay, hinder or defraud creditors. "A conveyance by a debtor to secure his property from immediate subjection to debts of creditors is a fraudulent act on his part, and as to him void as against them, though honestly made, the debtor intending that his creditors shall be ultimately paid." _Edgell_ v. _Smith_, 50 W. Va. 356, 40 S. E. 462.

Having shown the deed to A. P. Murrin to be a fraudulent conveyance, plaintiff then invokes the familiar doctrine that "Where a contract has been made to accomplish a fraudulent purpose, a court of equity will not at the suit of a party to the fraud—a _particeps doli_—if the contract is executory, either compel its execution or decree its cancellation, nor.

after it has been executed, set it aside and thus restore to the plaintiff the property or other interest, which he has fraudulently transferred. It will leave the parties in the position in which they have placed themselves.'' Such is the language used by this court in *McClintock* v. *Loisseau,* 31 W. Va. 865, 8 S. E. 612, 2 L. R. A. 816, and the soundness of the principle can not be doubted. See: Vol. 1, Pomeroy's Equity Jurisprudence (4th ed.) §401, citing: *Hubbard* v. *Robrecht,* 75 W. Va. 566, 84 S. E. 379, and other cases.

Defendant, however, claims that while the principle might have application were defendant attempting to set aside his own conveyance to his brother, it has none in the case at hand, where a subsequent conveyance, a deed executed by his fraudulent grantee, is the object of the attack. We can not credit this argument. In defendant's own pleadings, we find that his theory is that plaintiff merely succeeded defendant's brother as trustee of the legal title. The rule quoted above "applies not only to the original parties to the fraudulent transaction, but also to their heirs and all parties claiming under and by title derived from them where no equitable rights intervene to protect such parties.'' *Urpman* v. *Lowther Oil Co.,* 53 W. Va. 501, 44 S. E. 433; 12 R. C. L. tit. Fraudulent Conveyances, §120.

So far as the right of defendant to a reconveyance is concerned, plaintiff occupies no different position from that of A. P. Murrin, defendant's brother. There was no intervention of equitable right to protect defendant or afford him a better remedy. A court of equity can afford him no relief, but must leave the parties in the situation in which they have placed themselves.

The answer to the third question, that is, whether the court properly refused plaintiff a divorce from bed and board, should be obvious from the history of plaintiff's conduct as we have outlined in this opinion. She is in no sense entitled to a divorce. *Maxwell* v. *Maxwell,* 69 W. Va. 414, 71 S. E. 571; *Hall* v. *Hall,* 69 W. Va. 175, 71 S. E. 103.

For all these reasons, we reverse the decree of the circuit court, and dismiss the bill of complaint and cross-bill.

*Reversed; bill dismissed.*