# CHARLESTON.

## MARY M. SHARP v. EDGAR I. SHARP.

Submitted October 3, 1922.   Decided October 10, 1922.

1. DIVORCE—*Refusal to Allow Suit Money Not Ground for Reversing Decree Refusing Absolute Divorce, Where no Motion Made.*

   Failure of the court to allow suit money and temporary alimony in accordance with the prayer of the bill, will not be ground for reversal of a decree refusing divorce *a vinculo matrimonii*, where it appears that no motion was made for such relief, and the matter was never brought to the court's attention. (p. 683).

2. SAME—*Adultery May be Proved by Clear Circumstantial Evidence and Fair Inference.*

   In a suit for divorce, adultery may be proved by circumstantial evidence of a clear and positive nature showing opportunity as to time and place, and leading the mind to conclude by fair inference from all the circumstances that the act was committed. (p. 683).

Appeal from Circuit Court, Pocahontas County.

Suit by Mary M. Sharp against Edgar I. Sharp. From a decree dismissing her bill for divorce, plaintiff appeals.

*Reversed; Decree entered here; Cause remanded.*

*F. R. Hill* and *L. M. McClintic,* for appellant.
*H. S. Rucker* and *N. C. McNeil,* for appellee.

LIVELY, JUEGE:

Mary M. Sharp, plaintiff below, prosecutes this appeal from a decree entered on the 4th day of June, 1921, which dismissed her bill for divorce. The ground on which she sought divorce was adultery committed by her husband, Edgar I. Sharp, with Annie Lange, in an abandoned livery stable in the town of Marlinton on the 7th day of May, 1920. There is no other act of adultery on his part sought to be proven, and the whole case turns upon the evidence of the offense committed on this one occasion. There is consider-

able evidence pro and con with reference to clothing, farm products and money alleged to have been furnished by the defendant to the plaintiff after the separation. Defendant sought to prove that he had furnished certain stated amounts of money to his infant daughter, Icie, who was living with her mother, and various items of produce and the like to the plaintiff after the separation. Various witnesses for the plaintiff contradict him in some particulars with reference to the amount furnished or claimed to have been furnished. This evidence throws little light upon the main issue, and was evidently introduced for the purpose of casting some reflection upon the statements in that regard made by defendant, by showing that his recollection or veracity was imperfect.

The parties were married in 1892, and were each about forty-eight years of age, and resided within four miles of the town of Marlinton. Five children have been born to them, one had died, three of the others were married and had left home, and one, the youngest of the children, Icie, a girl of seventeen, remained with her parents. Considerable property had been accumulated by the industry and frugality of each of the parties, and they owned one or two tracts of land, the title to which was in the wife.

One ground of error asserted as cause for reversal of the decree was that neither suit money nor temporary alimony was awarded plaintiff, although she asked for both in the prayer of her bill. The record does not disclose that any motion was made for either, and neither could have been under consideration by the court until the final hearing was had, when the bill was dismissed for want of merit. There was no refusal, nothing brought before the court for refusal, and the point is not well taken.

On the 7th of May, 1920, there was a traveling show in Marlinton, which the parties attended, together with their daughter, Icie, having ridden to the town on three horses which defendant placed in the old abandoned livery stable near the railroad, and known as the "McLaughlin Livery Barn." This barn was open, and had not been used by the

owner for a considerable time, but had been frequently used by defendant for stabling his horses. Near the entrance on the first floor was a small room known as the "office" and immediately over it on the second floor was another room of similar dimensions, in which the attendant or watchman at the stable formerly slept. In this last mentioned room was a cot on which was a set of old springs, and the door leading from the room faced the stairway, the bottom of which was within a few feet of the lower room and ran up to the second story. This second story or "mow," as it was called, was vacant. There was another room in one of its corners in which there was no furniture of any kind.

While the plaintiff and her sister, Mrs. Hebb, whom she had met in town, were standing near the burnt corner opposite the bank, she perceived her husband approaching rapidly from the direction of the stable and looking around as if on the watch for some person. He then went toward the river and as he turned the corner in the direction of Baxter's garage he again stopped and looked around as if seeking some one. About the same time, Annie Lange, a woman of easy virtue and chastity, appeared, going in the same direction. Plaintiff's suspicions were excited, and she asked her sister to accompany her on investigation. They proceeded in the same direction, and finally came to the livery stable. No one appeared to be about. When they entered the building they heard the voices of a man and woman in conversation, followed by shuffling of feet and the creaking of springs on the cot which they located as immediately above their heads on the second floor. While they remained near the office and stairway, Annie Lange came down the stairs with a pocket book in her hand in which she was placing some paper money. She passed near the two women and out of the livery stable without saying anything. About the time she left the building, defendant came down the stairway, and the plaintiff says he was buttoning his pantaloons which were open at the top. He was immediately accosted by plaintiff, and accused of improper relations with the Lange woman. He denied the charge, and

immediately left the stable without any explanation, telling his wife to keep her "damn mouth shut." After staying at the stable a short time the two women went back up to the main street of the town where they separated, the plaintiff announcing her intention of consulting a lawyer. Defendant denies that he had any illicit relations with the Lange woman on this occasion or at any other time. His explanation is that he had brought to town a quart bottle of colic medicine for one of the horses which was subject to that ailment, wrapped up in a gum coat, tied to his saddle; that he desired to separate the contents of the bottle into pint bottles so that if perchance one bottle was broken the contents of the other would be safe; that he had procured the pint bottles and had gone to the stable for this purpose, had taken the quart bottle up the stairway to the mow and was standing at the head of the stairs near a barrel which contained old bottles, and was engaged in the separation of the contents of the bottle into two parts, and had hid one of the bottles in the barrel which he covered over, when this Lange woman came out of the little room, passed him and went down the stairway. He put one of the pint bottles of medicine in his pocket and followed her down the stairway where he met his wife who accused him of having improper relations with the Lange girl, which he denied. He denied that he buttoned up his pantaloons as he came down the steps. He states that he then left the stable with the two women in it, and went on up town. He said that he had a recipe for this horse colic medicine, and that he had been using it at various times for two or three years and had it filled at Kee's drug store, and upon a prescription by a physician, and that the last time it was filled, the prescription was given by Dr. John M. Yeager. Dr. Yeager was placed on the stand and testified that he had never at any time given defendant a prescription for horse colic, nor was it shown by Kee, the druggist, whose place of business was very near to where the depositions were taken, that any such compound had been purchased at his drug store. Sam Sharp, a son of the parties, testified that he had requested

his father to bring colic medicine to town on the show day in order that he might give some of it to a horse, which he, Sam, owned. He said that one bottle was put in the curry-comb box on the first floor and the other was taken up stairs by his father and put in a barrel. Just when this hiding of the bottles occurred is hard to determine. It appears that defendant brought one bottle, a quart bottle, in his gum coat from home. He says he took this quart bottle up stairs for the purpose of putting the contents into two pint bottles, one of which he hid in the barrel at the top of the stairs, and the other he placed in his pocket, and carried out with him when he left his wife and sister-in-law in the building. He does not say that he, at that time, put this pint bottle in the currycomb box or left it anywhere in the building. His wife and sister-in-law say that he came down the stairs, and after the colloquy hereinbefore detailed, left the stable in a hurry. Just when the bottle was placed in the currycomb box does not satisfactorily appear. Sam says that he thinks he used medicine out of it for his horse about eleven or twelve o'clock that day, which was about the time the Lange woman was there, as fixed by the other witnesses. It appears also that the defendant revisited the stable in the afternoon, when he took some intoxicated friend off the street and deposited him in one of the rooms on the second floor of the stable.

If there was a division of the contents of the quart bottle into two pint bottles and one of them placed in the curry-comb box on the first floor, it must have been done after the time defendant says the Lange woman passed him at the head of the stairs. At that time the entire bulk of the colic medicine was up stairs, and if Sam treated his horse out of this medicine from a bottle which was in the currycomb box, it must have been subsequently placed on the first floor. Surely it was not placed there by defendant at the time he had the heated conversation with his wife when he came down the stairs. The Lange woman testified, corroborating the defendant in the main particulars. Her explanation of her presence is that she went to this abandoned stable and

room on the second floor for the purpose of meeting a particular friend, Neil Fisher, who lived at Richwood; that she did meet him there on that occasion, she having selected the place of meeting; that she left him in the room and passed Sharp at the head of the steps. She says she had no improper relations with defendant on that or any other occasion, and scarcely knew him. There is some evidence tending to show that on a former occasion she had ridden into town with defendant on his wagon, one of his sons possibly being on the wagon at the same time. It is significant that no one saw Neil Fisher in Marlinton on that day or near this stable. No explanation is given why his deposition was not taken or attempted to be taken. There is no evidence that such a man exists except the statement of the Lange girl, whose evidence is entitled to but little weight.

It is argued that it would be unreasonable, on account of the location of this stable and this particular room, and the easy access of any one thereto, to presume that the defendant would meet this woman in that place for illicit purposes; and yet the Lange woman says that she went there to meet Fisher. It was sufficiently secluded and secret for her. It was the place she had selected to meet her friend. Defendant knew its seclusion perhaps better than any one, for he was a frequent user of the stable. He took his intoxicated friend there to escape public notice.

It is well established that adultery may be proved by circumstantial evidence, but the evidence must be clear and positive, showing opportunity as to time and place to commit the act, and a willingness on the part of the defendant. *Pollock* v. *Pollock,* 71 N. Y. 137. Acts of adultery are usually clandestine, and usually in such places as would reasonably preclude the possibility of discovery; the parties are rarely discovered in the direct act, and hence all of the circumstances should be carefully considered. *Daily* v. *Daily,* 64 Ill. 329, and *Commonwealth* v. *Gray,* 129 Mass. 474. "Adultery is peculiarly a crime of darkness and secrecy; parties are rarely surprised in it; and so it not only may, but ordinarily must, be established by circumstantial

evidence. The testimony must convince the judicial mind affirmatively that actual adultery was committed, since nothing short of the carnal act can lay the foundation for a divorce. It is, generally speaking, necessary to prove that the parties were in some place together where the adultery might probably be committed." Bishop, Marriage and Divorce, Vol. 2, sec. 613; *Musick* v. *Musick*, (Va.) 13 S. E. 302.

Do the circumstances, reasonably considered, impel the conclusion that adultery was committed by defendant with the Lange woman? There can be no question that they were in the stable on the second floor nor can there be any question that they left the streets of the town and went there about the same time. Defendant's explanation of his presence on the second floor for the purpose of dividing the horse colic medicine, taken together with that of his son who found a portion of it in the currycomb box on the first floor, is not very satisfactory. Defendant is flatly contradicted by Dr. Yeager with reference to procuring this medicine by prescription; and the evidence of the druggist, although readily at hand, is not taken. It must be remembered that the plaintiff and her sister heard the voices of a man and a woman in the room above them, and defendant, if he was at the head of the stairs where he says he stood, could have more readily heard the same voices. The fact that no one saw Fisher about the stable nor about the town and that no attempt was made to show that such a person existed, would lead us to draw the inference that no such man existed or if he in fact existed he was not in Marlinton on that day. It must be observed that when defendant was caught with this woman of easy virtue under such compromising circumstances by his wife and her sister he made no explanation; he dismissed the charge by denying it and immediately left in a hurry. If there was an explanation of his presence on the second floor, and in near proximity to the room from which emanated suspicious sounds, then was the time for it. If the bottle of colic medicine was then hid in the barrel at the head of the stairs and the other bottle in his pocket

at that time, it would have been most natural and reasonable for him, in order to allay the suspicions of his spouse, to exhibit them to her then and explain why it was necessary to divide and secrete the liquid. Instead of doing what an innocent husband would have done, he dismisses the whole matter by a flat denial and an injunction to his wife to keep her "damn mouth shut." His explanation of his presence, based on the division of the horse colic medicine, has the ear marks of an afterthought. Why make the division at that particular time? The quart bottle was resting securely in the gum coat and there was no danger of its being broken. If a portion of it could be secreted in the currycomb box by the wall, why should the other portion be secreted on the second floor? The defendant and the Lange woman deny the adultery, which is usual in such cases. If they had admitted it this case would not be here.

Carefully considering the evidence with the circumstances and explanations, we have come to the conclusion that there is a preponderance of evidence in favor of the allegations in the bill. We, therefore, reverse the decree of the circuit court entered on the 24th day of June, 1921, and grant the plaintiff a divorce from the bonds of matrimony as prayed for in the bill; and the cause is remanded for such further proceedings as may be necessary.

*Reversed; Decree entered here; Cause remanded.*