HAZEL A. SHOOK *v.* HENRY L. SHOOK

(No. 7000)

Submitted October 28, 1931.    Decided November 10, 1931.

*Charles J. Schuck* and *Hugo F. Blumenberg,* for appellant.
*A. E. Bryant* and *Russell B. Goodwin,* for appellee.

WOODS, JUDGE:

Hazel A. Shook brought a suit in the circuit court of Ohio County praying for an absolute divorce from Henry L. Shook, on the grounds of cruel treatment and adultery. Defendant filed an answer and cross-bill, alleging therein, among other things, that the plaintiff had been guilty of adultery, and prayed for an absolute divorce, and in event of refusal, that

he be granted a divorce *a mensa et thoro* on the grounds of desertion. Plaintiff filed a replication to the cross-bill. After a hearing, the chancellor entered a decree denying both parties relief and dismissing the cause.

Counsel on both sides represented to this Court both in brief and oral argument that the chancellor had stated in an oral opinion that he had found both guilty of adultery. Plaintiff now seeks to have that finding reversed as to her, and a divorce from the bonds of matrimony granted, while the defendant cross-assigns error, praying that the finding be affirmed as to plaintiff's adultery, but reversed as to the finding against him, and a divorce *a vinculo matrimonii* granted him, as well as the care and custody of their infant son.

Was the chancellor warranted in finding the wife guilty of adultery? The definite charge in the cross-bill is "that the plaintiff on or about the ........ day of June, 1930, committed adultery" with an unknown man. The proof located the place between Oglebay Farm and Wheeling, i. e. just off the Pogue's Run Road, some distance above its junction with the Betheny Pike. The witnesses to the alleged act—Ruckman, a trader in automobiles and horses, and Crow, a trader in horses and cattle, both of Moundsville—were returning in the latter's car from a visit to the saddle club at Oglebay Farm. As they rounded a curve, about 9:30 o'clock one evening the fore part of June, 1930, they state that they saw the plaintiff and a man other than her husband in a compromising position on a blanket at a point on the creek bank some forty to sixty feet off the road to their left; that the woman and man were directly in front of a sport model Ford coupe, which was parked on the creek bank and facing the direction from which witnesses were approaching; that Crow drove on to the road junction, turned and drove back by the place very slowly; that the parties were then standing, the woman on the left side of the car (nearest the road) and the man on the right; that, after driving some distance, Crow again turned his car and started back, but the parties had gone.

What prompted the return to the scene of the alleged adultry? Ruckman, the first to testify, stated that "Crow

said that he thought he knew the car, that maybe it was Mr. Shook's car, by her being there, and wanted to see him something about trading something.'' However, Crow explains that he did not expect to see Mr. Shook; that his impression when they first passed was that the car was the property of a friend; that the parties were actually commiting adultery; and that it was impossible to identify anyone at that time. Even Ruckman's testimony on this point was that they were ''lying close, pretty close together.'' Why was Crow so interested in identifying the car under the circumstances? And why did he apparently drive off the road to within fifteen feet of the parked car on the second, the inspection trip? No words of greeting are recorded.

Crow's evidence is unique in that it patches up almost every apparent weakness in Ruckman's testimony. But yet it is silent regarding the topography of the road. Did it turn to the left or right? In other words, did the lights of his car sweep the position of the alleged adulterers? It would seem from the nearness to which he had to drive, in order to appease his curiosity regarding the ownership of the Ford coupe, that the parties must have been on the opposite side, where none but trained eyes could have detected their presence. No mention of the occurrence was made to their friend Shook, with whom they had traded over a period of years. Ruckman remembered speaking to one of Crow's laborers about it, and Crow made a remark to someone: ''You know, I think Mrs. Shook is stepping out some.'' The information got to Shook somehow, after his wife had instituted suit, and he immediately went to Moundsville to inquire. Neither of the witnesses was able to recall the names of any person with whom they came in contact at the saddle club the night of the alleged adultery. Ruckman's recognition of plaintiff was based almost entirely upon seeing her in and about defendant's home in Fulton at various times during the year and a half before the taking of the testimony (September 30, 1930), whereas defendant admitted that he had not lived at Fulton since June 1, 1928. Ruckman had never been at Mount de Chantal, defendant's present home. Ruckman and Crow failed to agree on the build of the man, but noticed the

woman·wore a black hat and a dark dress. In view of the indefiniteness of the testimony as to time and place, plaintiff was left to a general denial.

The evidence introduced to show seeming indiscretions on the part of the plaintiff in relation to the manager of the Peerless Paper Company, are not supported by testimony of the character demanded in sustaining proof of such conduct. Bowman's story of the "poker game," by means of which he got the number of the manager's car, which he stated Mrs. Shook was driving, and defendant's accidental discovery of a witness who thought he saw Mrs. Shook come out of the paper store on another occasion, are in the minds of the Court quite improbable.

The evidence to convict of adultery must be credible. *Commonwealth* v. *Cregor*, 7 Gratt. 591. We have held that the burden rests upon the complainant to make out his case by such clear and convincing evidence as to carry conviction to the judicial mind. *Criser* v. *Criser*, 109 W. Va. 696. In *Edwards* v. *Edwards*, 106 W. Va. 446, the following language appears: "No wife should be pronounced the violater of her most solemn vows unless upon evidence that will admit of no other conclusion. There must be convincing proof." Can we say in the instant case that the proof of plaintiff's alleged dereliction is such as to "carry conviction to the judicial mind"? A careful evaluation of the testimony leads the Court to a negative conclusion.

But, has the plaintiff proved the adultery of the defendant by·the degree of proof we have mentioned? It is an unquestioned fact that the defendant visited a house that bore a reputation of a house of ill fame in the City of Wheeling, near the hour of midnight and remained therein for over an hour. That upon emerging therefrom, he was accosted by his wife in· the following words: "I saw you both come out of that house, and I am surprised at you and I surely am done with you now. I suppose you got in there what you always wanted me to do all my life. I am finished with you now. I won't put up with this any longer." The defendant made no answer to this accusation. A witness for the wife went into this same place after the defendant had come out and was

met by a woman of the house who asked him if "he wanted a girl." Simultaneously four girls "very thinly clad" emerged from an unlighted back room and remained standing in the doorway. This visit to this particular house was taken after the plaintiff had overheard her husband say to his companion, one Delong, "We will run down over the creek and look the janes over and pick out a couple." On the morning after the wife further testifies that she overheard a conversation between the defendant and his companion, wherein Delong said " 'Hen, how in hell do you suppose your wife knew where we were going, when we didn't know it five minutes before ourselves.' He said, 'She must be very clever,' and he didn't know where she got the word. And then he said, '.Oh well she can't do anything, anyway, because she can't prove we were in there for that purpose,' and my husband spoke up and said, 'Yes, and it would have been too damn bad if they had caught us while we were in their'." The explanation that the defendant makes of his and Delong's conduct on this visit appears to merit but little credence. That they went there for the purpose of selling a radio in a house of prostitution somewhere between the hour of midnight and one hour thereafter on Sunday morning, is of itself most unlikely. Admitting that the wife had made the accusation at the time of the defendant's emerging from the house of ill fame, the weight attached to such failure to offer an explanation has oftimes been keenly and forsefully indicated by this Court. *Sharp* v *Sharp*, 91 W. Va. 678.

From the facts detailed, such denial would have been of little if any value. Taking into consideration all these facts, we feel constrained to affirm the trial judge in his finding that the charge of adultery against the defendant has been proved. Believing so, a decree will be entered here re-instating the bill of the plaintiff and decreeing her an absolute divorce, and the cause remanded for further procedings according to this opinion.

*Reversed in part; affirmed in part; remanded.*