FRANK WITT

*v.*

ETHEL VIRGINIA WITT

(No. 10696)

Submitted April 26, 1955.    Decided May 31, 1955.

44

*Harry R. Cronin, Jr., A. Blake Billingslea*, for appellant.

*Robert M. Amos, L. T. Eddy*, for appellee.

BROWNING, JUDGE:

Frank Witt brought this suit for divorce against his wife, Ethel Virginia Witt, alleging as grounds cruel and inhuman treatment and adultery. The defendant filed an answer alleging new matter and praying for affirmative relief on the ground of cruel and inhuman treatment, and the cause was referred to a regular commissioner in chancery for the taking of testimony and recommendations. The commissioner found that neither party was entitled to the relief sought, to which both excepted, and the Circuit Court of Marion County entered a decree awarding a divorce to the plaintiff, the custody of Carl Witt, a son sixteen years of age to the plaintiff, and custody of a thirteen year old daughter, Greta, to the defendant. The plaintiff was required to pay $30.00 a month for support of the daughter. Certain personal property, including a Dodge sedan automobile, was awarded to the defendant, and the claim of the defendant to the real property, title to which was in the name of the plaintiff, was denied the defendant. It was decreed that the costs of the suit should be paid equally by the plaintiff and the defendant.

The defendant was granted an appeal by this Court, the alleged errors in the decree being: (1) The granting of a divorce to the plaintiff; (2) the refusal to grant a

divorce to the defendant; (3) the adjudication of property rights of the parties; (4) the granting of the custody of the son to the plaintiff; and (5) requiring the defendant to pay half of the costs of the suit.

The plaintiff and the defendant were married in 1931, at which time the plaintiff, whose occupation was operator of a coal mine cutting machine, owned a parcel of land of approximately ten acres jointly with two other persons near Grant Town in Marion County. A division of property was made, and on the piece allotted to plaintiff, three dwelling houses and one storeroom were subsequently erected. The plaintiff performed practically all of the labor in the erection of the buildings in his spare time. Three children were born of this marriage, one, a son, now in the United States Air Force, a son, Carl, who was residing with the plaintiff at the time this suit was brought, and the third a daughter who was residing with the mother of the defendant, although in the custody of the defendant. After the completion of the storeroom in 1947, the plaintiff and the defendant began operating a small grocery store and lunchroom therein, with the defendant conducting the business primarily while the plaintiff continued to work in a coal mine. The business did not prosper, and within a very short time a beer license was obtained by the defendant, and thereafter, the place was operated as a combination grocery store, lunchroom and "beer parlor". There is conflict in the testimony of the litigants as to which suggested the addition of the beer business, but it appears that both waited on patrons of the establishment, although the defendant was the principal operator. The plaintiff testified that after the installation of beer the place of business did not close until around midnight, and the defendant began staying out until two or three o'clock in the morning, or later on frequent occasions. He further testified that for approximately a year prior to the separation, the defendant's failure to return home at a reasonable hour was due to her association with one Glenn McGuire, a resident of the area, with whom the plaintiff specifically alleges the

defendant committed adultery. He further states that McGuire became an almost daily customer of the establishment, and would often remain after closing time. He states that on one occasion he looked through a window of the establishment and observed the defendant and McGuire "kissing and hugging" for a period of approximately ten minutes. Several witnesses corroborated the plaintiff in his statement that McGuire was a frequent visitor to the establishment for a period of several months prior to the separation, which was about July 4, 1952, and thereafter up to the time of the taking of testimony before the commissioner. This was not denied by either the defendant or McGuire, but both denied that his visits to the place of business were for any improper purpose. At the time of the hearings, plaintiff was 49, defendant 43, and McGuire 41 years of age.

The defendant does not deny that from about the first of June, 1951, she refused to have sexual relations with the plaintiff, although thereafter often requested to do so. The defendant states that her reason for such denial was the fact that at about that time her eldest son joined the Air Force, that she was nervous and upset, and became hostile to the plaintiff because of his lack of sympathy for her in that regard. Although in her earlier testimony before the commissioner, which continued over a period of several weeks, she had denied knowing McGuire until the fall of 1951, she stated on cross-examination at a subsequent appearance, "I can tell you the first time I ever saw Glenn; it was in June he stopped in my place one time, 1951." McGuire, who at that time was married, testified that he and his wife were divorced in January, 1953. Several witnesses testified to seeing the defendant and McGuire on several occasions at night clubs in the City of Fairmont, and together in his automobile, although usually accompanied by other persons.

Plaintiff testified that prior to the separation there were many arguments between him and the defendant relative to her alleged conduct with McGuire, and that the

defendant told him "She loved him; she said she loved him and when she got rid of me she was going to marry him." On one occasion, he stated that the defendant, in referring to the plaintiff, stated: "Yes, she would say I am a dirty bastard and I am no good and somehow she is going to get rid of me, she hoped to Hell 'you bastard die so I can marry Glenn McGuire.'" The son Carl testified that he heard his mother tell the plaintiff that the reason she went out with McGuire was because she loved him. The witness John Koch testified that he heard the defendant tell the plaintiff that she loved McGuire. There was evidence that on an occasion when the eldest son Clarence was home on leave that an altercation occurred between Clarence and McGuire in the business establishment, and they were forcibly restrained by patrons of the place. The witnesses stated that McGuire was under the influence of liquor at the time, and approached Clarence at a booth protesting that he did not like to be "slurred behind his back."

There is testimony that the defendant attended at least two birthday parties given by McGuire, one at the home of McGuire, and the other at defendant's store, each beginning about 11:30 or 12:00 o'clock at night. Although McGuire and the defendant did not deny these statements, they contended that the plaintiff was invited to the first party. The plaintiff denied that he was invited. A witness for the plaintiff, Sarah Shackleford, housekeeper for McGuire, was present at a party at McGuire's home, and stated that although the guests were drinking intoxicants, she observed nothing irregular about the conduct of McGuire and the defendant, but that they sat beside each other in a large chair, and during the course of the evening pulled the witness upon their laps on several occasions.

The defendant and McGuire do not deny making a trip to Wheeling to attend the Shrine Circus, but they and defendant's mother stated that the latter and several children accompanied them on that occasion. The party

spent the night at a motel near the City of Wheeling. Furthermore, they do not deny making a trip to Detroit to visit a former daughter-in-law of the defendant's mother, but on this occasion they were accompanied by other members of the family. They spent two nights in Detroit. Neither do they deny a journey to Philadelphia while the taking of testimony before the commissioner was in progress, but again the defendant's mother and McGuire's children comprised the party, and upon all of these trips the defendant, McGuire and the defendant's mother deny any improper conduct or opportunity therefor between McGuire and the defendant. On the trip to Detroit, the defendant and her mother travelled as far as Morgantown in defendant's automobile, and thereafter all proceeded in McGuire's automobile. McGuire stated that the defendant's automobile was left in Morgantown because of mechanical trouble, but the defendant, when asked why she did not leave Grant Town in the McGuire automobile, stated: "I just didn't want to; that is just why."

Mrs. Dessie Wilson, a witness for the plaintiff, stated that she was visiting in the VanMeter home, which is situated in the Grant Town area, in the summer of 1952, when Mrs. Witt and others were present. She stated that Mrs. Witt talked on the telephone to someone called Betty, and Mrs. Witt asked if the father of the person to whom she was talking was at home. The witness further stated that Mrs. Witt informed the party to whom she was talking to have her father call Mrs. Witt when he returned. Shortly thereafter the telephone rang in the VanMeter home and Mrs. Witt promptly answered it. A short conversation ensued in which Mrs. Wilson heard only the words "no" and "yes". Within a few minutes after this conversation, an automobile was heard in front of the VanMeter home, and Mrs. Witt left the house without making any observation to anyone. It being nighttime, neither the automobile nor the driver was observed. Mrs. Witt returned about two hours later. The evidence shows that McGuire has a daughter named Betty. Al-

though McGuire denied in his testimony that he was the person who appeared at the VanMeter home, the defendant made no explanation of the episode.

Shortly before the taking of the testimony in this case, the defendant's mother moved from one of the plaintiff's houses, which she had been occupying for sometime, to a residence owned by McGuire. The defendant's mother stated, and she was corroborated by McGuire, that she paid thirty dollars a month rent to him. For sometime prior to the taking of this testimony, the defendant was living in her mother's home, although she still retained a room in the place where she had formerly lived, and accounts for her being in her mother's home by stating that the latter was in bad health.

The plaintiff testified to a conversation that took place between him, the defendant and McGuire at the business establishment in August, 1952, which was not denied by either the defendant or McGuire. These questions were asked and the following answers made: Q: "Tell us what happened."; A: "I said owned the place, I could close it up if I want to. Then McGuire said 'You don't close now; you get the hell out'."; Q: "Did you?"; A: "No, I didn't. He said you son-of-a-bitch, you don't provide enough for your wife and I feed your wife, he says to me; and she spoke up and said I am not his wife, and Glenn said you Bastard I take your wife any time I want to; he tried to push me; he say let's fight; she said I am a bastard and all such stuff like that; he pushed me around and I backed up in the kitchen and he says let's fight and whoever whips gets the woman. I said what are you talking, we don't live in the stone age any more. I says, my wife, she is married."

The defendant testified that the primary reason for the separation was because of an occurrence on July 3, 1952. She states that on that date the plaintiff came to the business establishment and told her that he was "getting tired of you running a whore house, I am not going to have it under my nose. That is what he told me, My mother was there. He said you get your God damn clothes out of the

50

house or I will throw them out in the rain; and it was raining." The defendant's mother corroborated her as to the language used on this occasion, but the plaintiff denied it, and is supported by the testimony of James Morrison who, all witnesses admit, was present. The defendant states that on the day following this occurrence, she went to her home while plaintiff was asleep and moved her clothes to one of the other residences on the plaintiff's property, which was at that time occupied by the defendant's mother. The defendant testified that the plaintiff on many occasions called her a "whore" and accused her of selling herself to other men, but this testimony is not corroborated, and is denied by the plaintiff.

The defendant, in further support of her allegations of cruel and inhuman treatment, testified that on one occasion, the plaintiff pushed her against some steps and injured her hip so that it was black for some time. The plaintiff does not deny this, but states that the defendant was trying to prevent him from entering the house, and that he pushed the door, and in pushing it, she was knocked against the steps. The defendant's mother, who was present, corroborates the plaintiff, and the defendant does not deny removing her shoes and striking, or trying to strike, the plaintiff with them on this occasion. The defendant further states that the plaintiff injured her ribs so severely that she had to be treated by a physician at a time when he was attempting to have sexual relations with her against her will. The plaintiff does not deny this charge, but states that he did not injure the defendant, and that he was unsuccessful in trying to have relations with his wife. His excuse for attempting to commit this act was based upon information, allegedly given him by his attorney, that it was not unlawful for a man to rape his wife. This attempted act, the defendant claims, is condonation of the alleged offenses of the defendant prior thereto.

Code, 48-2-11, provides that in divorce cases "* * * the bill shall not be taken for confessed, and whether the defendant answers or not, the case shall be tried and heard

independently of the admissions of either party in the pleadings or otherwise; and no decree shall be granted on the uncorroborated testimony of the parties or either of them. * * *" However, in *Finnegan* v. *Finnegan,* 134 W. Va. 94, 58 S. E. 2d. 594, the first syllabus point reads as follows: "In a suit for divorce, to comply with the statute, Code, 48-2-11, which provides that no decree shall be granted upon the uncorroborated testimony of the parties or either of them, it is not necessary to produce direct testimony of other witnesses to every act testified to by the party who seeks a divorce. Sufficient corroboration of the testimony of a party to such suit occurs when a considerable number of important and material facts are established by other witnesses or there is other evidence, circumstantial or direct, which strongly tends to support and confirm the testimony of the party who seeks a divorce."

This Court has held that the denial of sexual intercourse by a wife does not constitute cruel and inhuman treatment within the meaning of the statute. *Roush* v. *Roush,* 90 W. Va. 491, 111 S. E. 334. *Cottle* v. *Cottle,* 129 W. Va. 344, 40 S. E. 2d. 863. However, in *Croll* v. *Croll,* 106 W. Va. 691, 146 S. E. 880, it was decided that while the denial of sexual intercourse alone does not constitute ground for divorce, this fact, where established by the evidence, requires little more to constitute legal desertion justifying a divorce. The only syllabus point of that opinion states: "Though denial of sexual intercourse by one spouse with the other, without sufficient reason, does not alone constitute ground for divorce, yet, where such unjustifiable denial of sexual relation is accompanied by unwarranted suspension of substantially all other phases of marital duty, the offending spouse is guilty of legal desertion, though the parties occupy the same house, and the spouse offended against is entitled to a divorce."

The evidence of adultery in this case is wholly circumstantial. In 6 M.J., Divorce and Alimony, §9, the rule in this jurisdiction is well stated:

"Adultery is peculiarly a wrong of darkness and secrecy, wherein the parties are rarely surprised; hence, it follows that ordinarily the evidence is of necessity circumstantial. And circumstantial evidence in such cases is governed by the ordinary rules which obtain when it is elsewhere under consideration. Common sense and experience of men are the best guides.

"When the evidence relied on to prove adultery is circumstantial it should be carefully scrutinized and acted upon with caution, and it must be such as to convince the 'guarded discretion' of the chancellor that the act has been committed. At the same time, circumstantial evidence proceeds upon the doctrine of presumption, and when the combined facts and circumstances of a case, such as the obviously artificial defense offered by the husband in explanation of his relations with the corespondent, are considered from the standpoint of common sense and common human experience, a charge of adultery frequently must be conclusively inferred.

"The rule for the sufficiency of the proven facts to infer adultery is that if they are not reasonably reconcilable with the assumption of innocence yet are so with that of guilt the conclusion of guilt will be authorized. But it will not be if either they can be reasonably reconciled with innocence, or cannot with guilt. Circumstances merely suspicious are inadequate, though there are decrees of imprudence from which the offense will be presumed. Still, care and circumspection should attend all dealings with this class of evidence. Thus, in a suit for divorce, adultery may be proved by circumstantial evidence of a clear and positive nature showing opportunity as to time and place, and leading the mind to conclude by fair inference from all the circumstances that the act was committed. But such evidence must be so clear and strong as to carry conviction of the truth of the charge and if it does no more than raise a suspicion of chastity it is insufficient."

*DeBerry* v. *DeBerry,* 104 W. Va. 209, 139 S. E. 710; *Mil-*

ler v. *Miller,* 94 W. Va. 177, 118 S. E. 137; *Sharp* v. *Sharp,* 91 W. Va. 678, 114 S. E. 280.

In *Wolfe* v. *Wolfe,* 120 W. Va. 389, 198 S. E. 209, this Court held that the charge of adultery in a divorce case must be proved by clear, positive and satisfactory evidence, and to warrant such a finding "the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion. * * *"

In the first syllabus point in *Criser* v. *Criser,* 109 W. Va. 696, 156 S. E. 84, in quoting from *Murrin* v. *Murrin,* 94 W. Va. 605, 119 S. E. 812, this language was used: "* * * the burden rests upon the complainant to make out his case by such clear, strong and convincing evidence as to carry conviction to the judicial mind. * * *"

By the third syllabus point in *Schutte* v. *Schutte,* 90 W. Va. 787, 111 S. E. 840, it was stated this way: "* * * the burden rests upon plaintiff to make out his or her case by clear, strong and convincing evidence, sufficient to convince the judicial mind affirmatively. * * *" It has been said that in such a case the proof required lies somewhere between the preponderance of evidence rule in civil cases, and proof beyond all reasonable doubt necessary in a criminal case. *Wolfe* v. *Wolfe, supra.*

The rule which prevails in this jurisdiction and elsewhere is that a decree, based on conflicting evidence, will be reversed when it appears that it is contrary to preponderance of evidence, or is clearly wrong. It is equally well established that the findings of a trial chancellor, based on conflicting evidence, will not be disturbed on appeal unless such findings are clearly wrong, or against the preponderance of evidence. *Adams* v. *Ferrell,* 135 W. Va. 463, 63 S. E. 2d. 840. Many cases are cited in that opinion to the same effect.

The evidence in support of the allegation of adultery is circumstantial. Only the plaintiff testified to acts of physical intimacy between the defendant and the corespondent, indicative of possible sexual intimacy, which

acts were not denied, although defendant and McGuire deny the act of adultery. However, after a very careful consideration of the evidence showing the frequent association between the defendant and the corespondent over a long period of time, the statements made by each, the most damaging not being denied, the denial of sexual relations to the husband from approximately the time the defendant met McGuire, and the inferences to be drawn from the proved facts, this Court cannot say that the trial chancellor was clearly wrong in granting the prayer of the plaintiff's bill for a divorce. True it is that no one saw these parties commit adultery. Neither has anyone seen the wind, but when leaves hang trembling upon a tree, a prudent man may reasonably infer that the wind is passing by.

Code, 48-2-14, provides: "* * * nor shall a divorce be granted for any cause when it appears that the suit has been brought by collusion, or that the offense charged has been condoned, * * *."

The plaintiff does not deny that he attempted to have sexual relations with the defendant, at a time when he was convinced of her adulterous relations with McGuire, although most of the conduct of the defendant, upon which the plaintiff relies to sustain the allegations of his bill, occurred subsequent to that abortive gesture. Furthermore, this Court held in *DeBerry* v. *DeBerry*, 115 W. Va. 604, 177 S. E. 440, that: "* * * The literal or derivative meaning of the word 'cohabit' is to live together while its popular and often legal significance is to copulate. The latter interpretation was, in our opinion, intended by the legislature. * * *" The defendant in her testimony admits that no act of copulation took place between her and the plaintiff subsequent to June, 1951.

Code, 48-2-15, provides: "Upon decreeing a divorce, the court may make such further decree as it shall deem expedient, concerning the maintenance of the parties, or either of them; and upon decreeing the annulment of a marriage, or a divorce, the court may make such further

decree as it shall deem expedient, concerning the care, custody, education and maintenance of the minor children, and may determine with which of the parents the children or any of them, may remain; * * *." This language vests discretion in the trial court respecting the maintenance of the parties to a suit for divorce and their minor children, and the custody of such children. This discretion, though subject to judicial review, will not be disturbed on appeal, unless it is abused by the trial court. *Finnegan* v. *Finnegan, supra,* and many cases cited therein to the same effect. Likewise, Code, 48-2-11, provides that: "* * * Costs may be awarded to either party as equity and justice require, and in all cases the court, in its discretion, may require payment of costs at any time, and may suspend or withhold any order or decree until the costs are paid."

As no prejudicial error appears in this cause, the final decree of the Circuit Court of Marion County is affirmed.

*Affirmed.*