413 So.2d 337 (1982)
Drucilla Ann THERIOT, Plaintiff & Appellant,
v.
Russell HUVAL, Defendant & Appellee.
No. 8752.
Court of Appeal of Louisiana, Third Circuit.
April 14, 1982.
Shelton & Legendre, Thomas F. Porter, IV, Lafayette, for plaintiff & appellant.
Hawley & Schexnayder, W. Paul Hawley, Lafayette, for defendant & appellee.
Before CULPEPPER, SWIFT and DOUCET, JJ.
CULPEPPER, Judge.
This appeal involves a rule by the father, Russell Huval, against the mother, Drucilla Theriot, to change custody and terminate child support of their three minor children. *338 The trial judge changed custody to the father. The mother appeals. We affirm.

GENERAL FACTS
The parties separated on October 15, 1978, at which time the three minor children of the marriage remained with their mother in the family home in Breaux Bridge. A judgment of separation was rendered in favor of the wife on December 15, 1978, granting her custody of the three children.
In September, 1979, Mrs. Huval began dating Mr. Leo Quibodeaux, a divorced man who lives in Eunice. During the course of this relationship, Mr. Quibodeaux became a frequent visitor at Mrs. Huval's home and often stayed overnight with her children present.
On February 13, 1981, the parties were divorced by a judgment which also awarded the mother custody of the children and child support.
In May of 1981, the oldest child, Karla, left her mother's home and moved in with her father, because difficulties between Karla and her mother had precipitated two incidents in which Mr. Quibodeaux used physical force on Karla. Mrs. Huval agreed to the child's living with Mr. Huval, at least until she and Karla could resolve the conflicts between them.
On May 28, 1981, Mr. Huval filed a rule for legal custody of Karla and a proportionate reduction in child support. On June 11, 1981, he married again, this time to Theresa Huval, a distant cousin of the former Mrs. Huval. On July 29, 1981, Mrs. Huval countered by filing a rule to increase child support. Mr. Huval then filed an additional rule, seeking custody of all three children and termination of child support.
At the time of the trial, the children, Karla, Kayla and Kurry (the only boy), were 15, 11 and 6 years old respectively.
The three rules were consolidated for trial and heard on August 5-6, 1981. Pursuant to written reasons, final judgment awarding custody of all three children to the father and terminating child support was rendered August 20, 1981.

APPLICABLE LAW
LSA-C.C. Article 157 provides in pertinent part:
"Art. 157. Custody and tutorship of children; visitation rights of grandparents
A. In all cases of separation and divorce, and change of custody after an original award, permanent custody of the child or children shall be granted to the husband or the wife, or to both jointly by agreement of both the husband and wife, in accordance with the best interest of the child or children;"
A well settled jurisprudential rule in cases involving child custody is that the trial court's determination of what is in the best interest of the children must be accorded great weight by the reviewing court and may be overturned only upon a clear showing that the trial judge abused his discretion. Stephenson v. Stephenson, 404 So.2d 963 (La.1981); Bordelon v. Bordelon, 390 So.2d 1325 (La.1980); Cleeton v. Cleeton, on rehearing 383 So.2d 1231 (La.1980). A determination of the best interest of the children involves a consideration of the totality of the facts and circumstances of the children and the parents in each individual case. Ferguson v. Ferguson, 398 So.2d 1238 (La.App. 4th Cir. 1981).

SITUATION OF THE MOTHER
The mother and the two younger children were residing in Breaux Bridge at the time of the trial. Mr. Quibodeaux was living and working in Eunice, about 55 miles from Breaux Bridge, on a job which entailed his being on duty 12 hours a day for seven days, and then off duty seven days. On his seven days off duty, he began staying overnight at Mrs. Huval's home, at first only one or two nights a week, but later as much as five nights a week, up until two weeks before the trial of this matter. Some weeks he went alone. Other weeks he brought with him his two sons of his previous marriage, aged 11 and 12.
*339 Mrs. Huval and Mr. Quibodeaux testified that most of the time he slept in her living room or in the beauty shop connected to the house. Both stated they had never slept together in the house with the children present, but they admitted they did have sexual relations at various times, including three or four occasions at Mrs. Huval's residence and 15 or 20 times at his home in Eunice.
Both Karla and Kayla testified that they were aware that their mother and Mr. Quibodeaux had slept together in Mrs. Huval's bedroom at various times. 15-year-old Karla stated she knew this from discussions of the matter with her mother. Kayla, age 11, testified that she had actually seen the two of them in bed together, and she was aware of the sexual activity occurring between them.
Little attempt was made to be discreet about Quibodeaux's overnight visits in Mrs. Huval's home. Various friends, relatives and neighbors were aware of the fact that Mr. Quibodeaux frequently slept at the house. He would park his quite distinctive truck at Mrs. Huval's house or in the vicinity, where it was noticed. The two girls stated that the relationship between their mother and Mr. Quibodeaux was embarrassing to them.
When the couple first began dating, the Huval children got along with Mr. Quibodeaux fairly well. However, as noted by the trial court, over a period of time, his continued frequent presence and the presence of his two sons began to take their toll, especially on the two Huval girls.
Karla, now in her mid-teens, has developed problems in getting along with her mother. Mr. Quibodeaux's presence exacerbated the arguments which flowed from the discipline problems. On two separate occasions he became involved in these mother-daughter disputes. On the first of these occasions, because Mrs. Huval was unable to hold Karla in order to spank her, he held her down so that her mother could hit her with a belt. During the second incident, when Karla was very upset, crying and shouting, Mr. Quibodeaux hit and slapped her several times and then pushed her against a brick wall. As a result of this confrontation, Karla moved from her mother's household to live with her father, and a criminal charge was brought against Mr. Quibodeaux. He pleaded guilty to simple battery and paid a fine. After that, Karla visited her mother very little, since Mr. Quibodeaux continued to spend quite a lot of time at the house.
The trial judge stated in his written reasons that it is to Karla's best interest to continue to live with her father, as she is unquestionably much more settled there, and the situation at her mother's house was obviously intolerable for her.
The younger daughter, Kayla, has her own difficulty with the situation as it existed at the time of trial, not so much with Leo Quibodeaux as with his sons. She stated she never had any trouble with Mr. Quibodeaux, but since the second incident between him and Karla, she has been afraid of him. She does not, however, get along with his two sons, who are about her own age, because they harass her and will not allow her privacy or time for her own friends when they are there. Apparently, Mrs. Huval wants Kayla to entertain the two boys during their frequent visits, and Kayla feels that her mother always takes their side against hers in any disagreement.
Both Mrs. Huval and Mr. Quibodeaux testified that they plan to get married in the future, but no date has been set. Mrs. Huval recently lost her job in Breaux Bridge and has been seeking employment in Eunice. She plans to move to Eunice to be near Quibodeaux, whether they are married or not, and wants to move the children with her.
There was no attempt to show that the physical needs of the children have not been provided by Mrs. Huval, or that the children have been physically neglected.

SITUATION OF THE FATHER
Mr. Huval also resides in Breaux Bridge, in a three bedroom home. In June of 1981 he married Theresa Huval, who is distantly *340 related to his former wife, and has known the children for six or seven years. She used to babysit for them frequently. According to all the testimony, the children get along with her very well. The evidence indicates that Mr. Huval has a very close relationship with all of his children, and concerns himself with their education, discipline and religious training. He spends as much time as possible with them.
The mother admits Mr. Huval has always been hard working and sober, and is well able to provide his children's needs. He has always contributed to their support. He is settled in his employment, which allows him time with the children, and is also settled in his home life.
His wife will be available to care for the children while he is working. Plaintiff-appellant has raised a question as to whether Theresa Huval is a suitable person for the responsibility, since she had not seen her own 13-year-old son of her prior marriage in two years at the time of this trial. However, the trial judge was able to view her demeanor while on the stand and accepted her explanation that the child had been alienated from her by his father, and had expressed a desire not to see her. The judge found that this fact did not render her unfit to provide guidance and day-to-day care for the children with whom we are concerned here.
Plaintiff-appellant argues the evidence that Mr. Quibodeaux did not regularly sleep in her bedroom shows they do not live in concubinage. She cites Cleeton v. Cleeton, supra, where the mother was guilty of weekly adultery, but not concubinage. Our Supreme Court stated there that a custody award is not a tool to be used to regulate human behavior, and may not be used to punish a mother for past behavior when there is no proof of detrimental effect on the children. Plaintiff contends that the instant case and Cleeton, wherein the Supreme Court returned custody to the mother, are very similar factually. We nevertheless note that Cleeton also stands for the proposition that the determination of the trial court shall not be disturbed upon appeal unless clear abuse of discretion is shown. In Cleeton the trial court initially left custody of the children with the mother, favoring stability of environment and noting that the children had prospered under her care. This judgment was reversed by the Court of Appeal, but the Supreme Court held that the trial court determination was entitled to greater weight than it had received. It was held that the lower court had not abused its discretion, and that its judgment should be reinstated.
In the recent case of Stephenson v. Stephenson, supra, the facts were that at the time of the hearing on the preliminary custody rule the mother was living in concubinage, but at the time of the subsequent hearing for permanent custody her paramour had moved out of her trailer home. Both testified they planned to marry as soon as the paramour's divorce became final. Before rendering his final decision, the trial judge satisfied himself outside the record that the mother had actually married her paramour, and then the judge granted the mother permanent custody of a four-year-old girl. The Court of Appeal reversed on the basis of Schexnayder v. Schexnayder, 371 So.2d 769 (La.1979). The Supreme Court granted writs and reversed the Court of Appeal and reinstated the trial court judgment. It held Schexnayder is distinguishable since there the mother's sexual relations were so indiscreet that it would have had a detrimental effect on the children, and, moreover, that the evidence showed the mother neglected the physical needs of her children. The court stated the trial judge erred in going beyond the record for confirmation of the marriage, but the record showed they intended to marry as soon as the paramour's divorce became final. In Stephenson, the Supreme Court also emphasized the rule that in child custody cases the determination of the trial judge is entitled to great weight and will not be disturbed unless a clear showing of abuse of discretion is made. The present case is readily distinguished from Stephenson for the reasons that the trial judge here found in his discretion that the best interest *341 of the children will be served by awarding their custody to the father, and the totality of the evidence here supports this conclusion.
We feel that in the case before us the trial court properly considered not only the moral aspect of the mother's relationship, but the effect of the relationship as a whole on the children. The two girls testified they were not only embarrassed by their mother's sexual relations with Mr. Quibodeaux, but also they were afraid of him and were resentful of their mother's favoring him and his children over her own children. The trial judge summarized his findings as follows:
"Unfortunately, it is clear to the Court that Drucilla Huval is putting her affection for her paramour ahead of the best interest of her children. The almost public display of Quibodeaux spending the night very frequently at Drucilla Huval's home indicates a lack of concern for the welfare of the children and the feelings about the public in general. The further statement that she will follow her paramour to Eunice, uproot the children from their home, friends, family and school in Breaux Bridge, clearly indicates that she is just not thinking clearly of the welfare or the best interest of her children."
The father, on the other hand, is settled in Breaux Bridge and plans to remain there. All the children have always lived in Breaux Bridge, and all their friends and family are there. Mr. Huval has shown that he can provide more than adequately for his children's needs and furnish them with a good home life. Stability of environment is certainly relevant to a determination of the best interest of the child, and is to be weighed with all the other factors relevant to such a determination. Bordelon v. Bordelon, supra. While it might not generally be in the best interest of the child to be moved from one parent to another, and these children have long been in their mother's care, inasmuch as she plans to move elsewhere in order to continue seeing her paramour, a change in custody in this case will promote rather than defeat stability, since the father plans to remain in Breaux Bridge.
Both of the girls testified they preferred to live with their father, and especially wished to remain in Breaux Bridge rather than move to Eunice. As this Court held in Vidrine v. Demourelle, 363 So.2d 943 (La.App. 3rd Cir. 1978), it is proper to give more than casual consideration to the wishes of the children in light of their feelings of insecurity which would be experienced if placed with a certain parent. That case also involved two daughters who were much the same age as the Huval girls.
The trial court found that clearly the best interest of Karla and Kayla would be served by their remaining in Breaux Bridge with their father. He stated in written reasons that it would be intolerable for Karla to stay with her mother "certainly not in Eunice, and not even in Breaux Bridge, with Quibodeaux around." Kurry, age 6, apparently has no problem with the situation as it exists at present, inasmuch as he is not yet of the age of discernment. However, leaving the custody of this child with his mother would ultimately result in his being uprooted from a familiar environment, and separated from his sisters and father, as well as his other relatives and friends. The rule on split custody was stated by our Supreme Court in Tiffee v. Tiffee, 254 La. 381, 223 So.2d 840 (1969):
"[1] The separation of children of a family, though sometimes necessary, is a custodial disposition that courts seek to avoid. Normally, the welfare of these children is best served by leaving them together, so they can have the full benefit of companionship and affection. When feasible, a court should shape its orders to maintain family solidarity."
See also Schramm v. Simpson, 343 So.2d 423 (La.App. 3rd Cir. 1977); Arnold v. Arnold, 376 So.2d 528 (La.App. 3rd Cir. 1979). The trial court found that here such a separation of the children would be both unnecessary and undesirable.
We conclude there is no clear abuse of the trial judge's discretion.
*342 For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against plaintiff-appellant.
AFFIRMED.