326 S.E.2d 189

**Homer GRAHAM, Jr.**

v.

**Susan Jane GRAHAM.**

No. 16322.

Supreme Court of Appeals of
West Virginia.

Dec. 10, 1984.

Rehearing Refused Jan. 10, 1985.

Dissenting Opinion Feb. 6, 1985.

William W. Talbott, Talbott & Alsop,
Webster Springs, for appellee.

John G. Garden, Bachamnn, Hess, Bachmann & Garden, Wheeling, for appellant.

PER CURIAM:

The appellant, Susan Jane Graham, appeals from a final order of the Circuit Court of Clay County which, *inter alia,* awarded her former husband, Homer Graham, Jr., the appellee, custody of one of the two children born of the parties' marriage, Anne Susan Graham. For the reasons set forth below, we affirm.

On November 24, 1982, the appellee filed suit for divorce in the Circuit Court of Clay County alleging desertion and mental cruelty. He sought custody of the parties' two infant children, Anne Susan Graham, age six, and Michael Homer Graham, age eight months. The appellant subsequently filed an answer denying the allegations of desertion and mental cruelty. She counterclaimed on the grounds of cruelty and irreconcilable differences and also sought custody of the two infant children. In his reply, the appellant admitted that irreconcilable differences did exist between the parties.

On March 23, 1983, a final hearing was held on the issues raised. At the conclusion of the hearing, by order entered April 26, 1983, the court awarded the divorce on the grounds of irreconcilable differences pursuant to *W.Va.Code*, 48–2–4(a)(10) [1977]. In addition, the divorce order awarded custody of Anne Susan Graham to the appellee, finding that neither party was an unfit parent and that the appellee had been the primary caretaker of the child under the principles of *Garska v. McCoy,* 167 W.Va. 59, 278 S.E.2d 357 (1981). The appellant was awarded custody of Michael Homer Graham and both parties were granted visitation privileges.

In this appeal the appellant alleges that the court erred in awarding custody of Anne to her former husband because the evidence did not establish that he was the primary caretaker of the child.

"The primary caretaker is that natural or adoptive parent who, until the initiation of divorce proceedings, has been primarily responsible for the caring and nurturing of the child." Syl. pt. 3, *Garska, supra.*

While we recognized in *Garska* that it is difficult to enumerate all the factors that will contribute to a conclusion that one or the other parent is the primary caretaker, we set out certain criteria to which a court must look:

> In establishing which natural or adoptive parent is the primary caretaker, the trial court shall determine which parent has taken primary responsibility for, *inter alia,* the performance of the following caring and nurturing duties of a parent: (1) preparing and planning of meals; (2) bathing, grooming and dressing; (3) purchasing, cleaning, and care of clothes; (4) medical care, including nursing and trips to physicians; (5) arranging for social interaction among peers after school, i.e. transporting to friends' houses or, for example, to girl or boy scout meetings; (6) arranging alternative care, i.e. babysitting, day-care, etc.; (7) putting child to bed at night, attending to child in the middle of the night, waking child in the morning; (8) disciplining, i.e. teaching general manners and toilet training; (9)

educating, i.e. religious, cultural, social, etc.; and, (10) teaching elementary skills, i.e., reading, writing and arithmetic.

The record in this case contains evidence which, though contradicted by the appellant, showed that the appellee cooked for Anne and cared for her daily needs, bathed her and dressed her part of the time, arranged alternative care for her, put her to bed at night, and tended her during the night. There was also evidence that he was involved in her religious and ethical training as well as taking her to school. While the appellee conceded that both he and his wife had participated in the care of the child while they were living together, he stated that even during that period "I was never afraid of diapering her and I bathed her and cared for her and spent time with her." His testimony was corroborated to some extent by other witnesses.

■ Similarly, there is evidence that the appellant also performed these duties. Having read the record carefully and considered the evidence in its totality, we conclude that the facts of this case do not demonstrate that one or the other parent clearly is the primary caretaker but that both shared equally in their daughter's care. *Garska v. McCoy, supra,* provides for such a finding and holds that when child care and custody are shared in an entirely equal way, no primary caretaker presumption arises and the court must inquire further. Syllabus Point 5 of *Garska* states:

> If the trial court is unable to establish that one parent has clearly taken primary responsibility for the caring and nurturing duties of a child neither party shall have the benefit of the primary caretaker presumption.

In any event, in *Garska* we pointed out that the presumption in favor of a fit primary caretaker parent applies only to children of tender years. "Where a child is old enough to formulate an opinion about his or her own custody the trial court is entitled to receive such opinion and accord it such weight as he feels appropriate." *Id.* 167 W.Va. at 70, 278 S.E.2d at 363. "When, in the opinion of the trial court, a

child old enough to formulate an opinion but under the age of 14 has indicated a justified desire to live with the parent who is not the primary caretaker, the court may award the child to such parent." *Id.*

■ The record in this case indicates that the trial court did consider Anne's feelings about her parents when he stated at the conclusion of the hearing that "[t]here is also no question in my mind but what Anne is a daddy's girl." The court clearly had the opportunity to observe the child and her demeanor and the fact that he was not able to articulate the child's views at length is unfortunate but not critical to the decision of this case under the circumstances. Although the court might have been a bit more specific and stated his reasons for this conclusion in the record, remanding the case for a more detailed pronouncement by the court would probably not change the end result.

■ " 'A trial court, by statute, is given discretion as to the adjudication of ... custody of minor children ... and its decree in regard thereto will not be disturbed in the absence of a clear abuse of such discretion.' Syl. pt. 4, *Witt v. Witt*, 141 W.Va. 43, 87 S.E.2d 524 (1955), in part." Syllabus Point 1, *McAllister v. McAllister*, 166 W.Va. 569, 276 S.E.2d 321 (1981).

Accordingly, for the reasons set forth above the judgment of the Circuit Court of Clay County is affirmed.

Affirmed.

MILLER, Justice, dissenting:

My dissent is predicated on several grounds. First, I believe that the lower court abused its discretion in finding that the mother did not meet the primary caretaker standard under *Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981). Second, the trial court improperly gave weight to the six-year-old daughter's desire to be with her father. Finally, I think that the trial court should have considered the impact of separating the two young children by dividing the custody of them between the parents.

Even a cursory review of the record makes it manifest that Mrs. Graham was the primary caretaker of both children. The daughter, Anne, was born in 1976, approximately three years after the parents were married. Mrs. Graham did not pursue gainful employment after Anne was born, except for a two and one-half month period in 1978 when she worked at a local library.

Prior to moving in 1977 from Ohio to Clay County, West Virginia, Mr. Graham taught school during the day and worked in the evening remodeling the home or with his brother in the latter's junkyard business. He also attended night classes as well as the local basketball and football games. Much this same pattern occurred after his move to Clay County where he teaches at the Clay County High School and is its band director.

When the parties separated in June 1982, the daughter Anne was six years old. It is obvious to me that Mrs. Graham, who was home on a daily basis taking care of Anne while Mr. Graham worked, was Anne's primary caretaker.

It may be that the trial court thought that Mr. Graham had become the primary caretaker by virtue of having physical custody of Anne for some months prior to the final divorce hearing. This custodial arrangement occurred because Mr. Graham took Anne away with him after visiting his wife and children in Ohio. Mrs. Graham had returned to her parent's home in Ohio with the two children after the parties had separated in June. In *Garska*, 167 W.Va. at ——, 278 S.E.2d at 363, we made it abundantly clear that: "[I]t is incumbent upon the circuit court to determine as a threshold question which parent was the primary caretaker parent *before the domestic strife giving rise to the proceeding began.*" (Emphasis added). Consequently, I believe that the majority is in error when it concludes that there was not sufficient evidence to warrant the conclusion that Mrs. Graham was the primary caretaker of Anne.

My second point of issue with the majority opinion is its utilization of the child's

preference to overcome the primary caretaker presumption. Admittedly, *Garska* recognized that this could be done, as indicated by this portion of Syllabus Point 7:

"Where there is a child under fourteen years of age, but sufficiently mature that he can intelligently express a voluntary preference for one parent, the trial judge is entitled to give that preference such weight as circumstances warrant, and where such child demonstrates a preference for the parent who is not the primary caretaker, the trial judge is entitled to conclude that the presumption in favor of the primary caretaker is rebutted."

Much of this language was taken directly from *J.B. v. A.B.,* 161 W.Va. 332, 340, 242 S.E.2d 248, 254 (1978), where in note 3, this language is found: "In West Virginia the principle is well settled that a child's custody preference can be considered and given appropriate weight, when the child is of the age of discretion. *State ex rel. Kiger v. Hancock,* 153 W.Va. 404, 168 S.E.2d 798 (1969); *Holstein v. Holstein,* 152 W.Va. 119, 160 S.E.2d 177 (1968)."

In *Kiger,* this Court concluded that two children, ages ten and eleven, could not have their preference made controlling because of their age and immaturity. Whereas, in *Holstein,* a twelve-year-old boy's preference was given some weight. This Court specifically noted that the trial court found that "he was a good student and was qualified to testify." 152 W.Va. at 125, 160 S.E.2d at 182.

The problem in the present case is that the daughter was only six years old. There is nothing in the record to reveal under the language of *Garska* that she was "sufficiently mature that [she] can intelligently express a voluntary preference for one parent." Syllabus Point 7, in part. In this case, the trial judge took the child into chambers, out of the presence of the parties and the court reporter. He then emerged and subsequently stated that Anne is a "daddy's girl." This does not meet our legal standard for giving weight to such a young child's preference.[1]

The trial court should have made an initial finding on the child's maturity and ability to make a voluntary preference. Next, at a minimum, the trial court should have summarized its finding on the record or had the court reporter transcribe the *in camera* proceeding and permit the parties to comment on it. Although this issue is not raised by the appellant, it is a troublesome area in domestic relations law, i.e., how to handle testimony of a child's preference. Our statute with regard to awarding custody is silent on the procedural aspects. W.Va.Code, 48–2–15.

There is merit in permitting the trial judge to conduct a neutral *in camera* interview on the preference question after a favorable resolution of the maturity or competency issue, as outlined by the New York Court of Appeals in *Lincoln v. Lincoln,* 24 N.Y.2d 270, 272, 247 N.E.2d 659, 660, 299 N.Y.S.2d 842, 843 (1969):

"It requires no great knowledge of child psychology to recognize that a child, already suffering from the trauma of a broken home, should not be placed in the position of having its relationship with either parent further jeopardized by having to publicly relate its difficulties with them or be required to openly choose between them."

It should be noted, however, that in *Lincoln* the court concluded: "We are confident that the Trial Judges recognize the difficulties and will not use any information, which has not been previously mentioned and is adverse to either parent, without in some way checking on its accuracy during the course of the open hearing." 24 N.Y.2d at 273, 247 N.E.2d at 661, 299 N.Y.S.2d at 845. Many courts have approved of trial judges discussing custody preferences with children *in camera* without the parents or their counsel present, provided procedures designed to protect the parents' rights are followed. *See also Bailey v. Bailey,* 3 Ariz.App. 138, 412 P.2d 480 (1966); *Spence v. Levi,* 133 Ga.App. 581,

---

1. A fuller treatment of this issue is contained in Siegel and Hurley, *The Role of the Child's Prefer-* *ence in Custody Proceedings,* 11 Family L.Q. 1 (1977).

211 S.E.2d 622 (1974); *Fohr v. Fohr*, 75 Ill.App.3d 575, 31 Ill.Dec. 171, 394 N.E.2d 87 (1979); *Marshall v. Stefanides*, 17 Md. App. 364, 302 A.2d 682 (1973); *Lesauskis v. Lesauskis*, 111 Mich.App. 811, 314 N.W.2d 767 (1981); *Callen v. Gill*, 7 N.J. 312, 81 A.2d 495 (1951); *Lavene v. Lavene*, 148 N.J.Super. 267, 372 A.2d 629 (1977); Annot., 99 A.L.R.2d 954 (1965). *Cf. S.L.M. v. J.M.*, 174 W.Va. 46, 321 S.E.2d 697, 699 (1984). *Contra Gennarini v. Gennarini*, 2 Conn.App. 132, 477 A.2d 674 (1984).[2]

Where both parties consent to the judge's interview, there is obviously no problem. Where consent cannot be obtained, it would appear advisable to have a record made of the *in camera* hearing and to permit the parties to have access to the record by way of an accurate or verbatim summary. A further opportunity should then be afforded for either party to contradict the accuracy of the facts given at the *in camera* hearing.

Finally, a comment is needed on the split custody of the two children. I do not find where we have had occasion to discuss this matter. New York's highest court has summarized the generally accepted rule in *Eschbach v. Eschbach*, 56 N.Y.2d 167, 173, 436 N.E.2d 1260, 1264, 451 N.Y.S.2d 658, 662 (1982):

> "Finally, this court has long recognized that it is often in the child's best interests to continue to live with his siblings. While this, too, is not an absolute,

the stability and companionship to be gained from keeping the children together is an important factor for the court to consider. 'Close familial relationships are much to be encouraged.' ... 'Young brothers and sisters need each other's strengths and association in their everyday and often common experiences, and to separate them, unnecessarily, is likely to be traumatic and harmful.'" (Citations omitted).

*See also Theriot v. Huval*, 413 So.2d 337 (La.App.1982); *Cochenour v. Cochenour*, 642 S.W.2d 402 (Mo.App.1982). Courts have recognized that separation of siblings may be warranted in certain situations where it clearly is in the best interest of the child, such as where a mature child specifies a strong preference for one parent coupled with some animosity toward the other. *Williams v. Williams*, 655 P.2d 652 (Utah 1982). In the present case, no such facts were demonstrated.

For the foregoing reasons, I respectfully dissent.

I am authorized to state that Justice McGRAW joins me in this dissent.

---

**2.** A comprehensive article on this subject is found in Jones, *Judicial Questioning of Children in Custody and Visitation Proceedings*, 18 Family L.Q. 43 (1984).